Arthur B. FORD, Plaintiff,

v.

Michael P. LANE, Director, Illinois Department of Corrections; Illinois Department of Corrections; J.W. Fairman, Warden, Joliet Correctional Center; Ronald M. Shanskey, Agency Medical Director for Joliet Correctional Center; Illinois Department of Corrections; Clyde Fortenbury, Superintendent of Correctional Industries at Joliet Correctional Center; Michael F. Johnston, Supervisor of "Mattress Factory" at Joliet Correctional Center; and Kathy Harkes, Health Care Administrator at Joliet Correctional Center, Defendants.

No. 88 C 7007.

United States District Court,
N.D. Illinois, E.D.

Jan. 27, 1989.

Arthur B. Ford, Joliet Correctional Center, Joliet, Ill., for plaintiff.

Dan Softcheck, Atty. General's Office, Chicago, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

In this pro se prisoner rights case under 42 U.S.C. § 1983 (1982), plaintiff Arthur Ford has sued the Illinois Department of Corrections ("IDOC") and several correctional officials, asserting that the defendants violated the eighth amendment's prohibition against cruel and unusual punishment. In essence, Ford claims that his work at the Joliet Correctional Center's mattress factory injured his already precarious health, and that the medical care he received both before and during his employment was inadequate. Presently before the Court is the defendants' motion to dismiss under Rules 12(b)(1)[1] and 12(b)(6)

---

1. The defendants never explain why they believe we lack subject matter jurisdiction so that dismissal under Rule 12(b)(1) would be appropriate. Clearly, we have subject matter jurisdiction to entertain claims arising under section 1983. *See* 28 U.S.C. §§ 1331, 1343(a)(3) (1982). Perhaps the defendants are referring to their eleventh amendment defense and to language

of the Federal Rules of Civil Procedure. For the reasons set forth below, the defendants' motion is granted.

## Background

We must construe the allegations in Ford's pro se complaint liberally. *See Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Martin v. Tyson*, 845 F.2d 1451, 1454 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988). In addition, because this is a motion to dismiss, we must accept the facts alleged, as well as the inferences reasonably drawn from these facts, as true. *Kush v. American States Insurance Co.*, 853 F.2d 1380, 1382 (7th Cir.1988). Read in this way, the complaint reveals that Ford started work at the Joliet mattress factory on January 21, 1985. Sometime before he was hired, Ford submitted an employment application to Michael Johnston, a supervisor of the mattress factory, and Clyde Fortenbury, the factory's superintendent. In the application, Ford stated that he suffered from enlarged left and right ventricles, that he was taking medication for this condition, and that his stomach bothered him on occasion. In addition, Ford's heart condition at this time required him to wear a "NitroPad"[2] on his chest. Ford does not allege that he included this fact on his employment application, but he does indicate that Kathy Harkes,[3] the Health Care Administrator at Joliet, or "others acting under her direct supervision" did know of the NitroPad. *See* Complaint—Statement of Legal Claims ¶ 8. Despite these health problems and despite the fact that Ford was fifty-one years of age at the time, Johnston and Fortenbury did not require a pre-employment physical examination before approving his application.

After Ford started work, he discovered that the employment conditions were far less than ideal. In particular, Ford claims that the ventilation in the area where he worked was inadequate to "purge out" the cotton dust, lint fibers, boric acid filaments,[4] and other dusts circulating in the air at the factory. According to Ford, neither Johnston nor Fortenbury informed him of these health hazards. Moreover, part of his job was to unload heavy boxes and large rolls of cotton when they were delivered. The heavy lifting and poorly ventilated environment soon took their effect on Ford. In 1987, he noticed that his health was beginning to deteriorate. In particular, Ford "started to experience a loss of appetite, a noticeable loss of weight, periodic dizziness and hot flashes, severe stomach problems, reoccurring headaches and chest pains, a lack of breath, and sometimes experienced difficulty in bending down or walking." Complaint—Statement of Facts ¶ 9. "[O]n more than one occasion," Ford went to see a prison doctor to complain of his health problems.[5] Al-

---

from *Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974), where the Court stated that "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." *See also Owen v. Lash*, 682 F.2d 648, 655 (7th Cir.1982) (Stewart, Retired Justice, sitting by designation). Nonetheless, even if the eleventh amendment immunity "partakes of the nature of a jurisdictional bar," it is not the same as a lack of subject matter jurisdiction: a state may waive its eleventh amendment immunity, but parties cannot waive our lack of subject matter jurisdiction. Accordingly, a Rule 12(b)(1) motion does not appear to be the correct method for raising an eleventh amendment immunity. No matter: our jurisprudence is one of substance and not of form, and we will consider the eleventh amendment issue when we come to it.

2. A "Nitro Pad" is apparently a small pad containing nitroglycerin that is worn on a person's chest. The nitroglycerin, which is absorbed directly through the skin, acts to keep the blood vessels dilated and thus increases the flow of blood to the heart. *See* R. Sloane, *The Sloane–Dorland Annotated Medical Legal Dictionary* 499–500 (1987).

3. The names of certain defendants are spelled inconsistently in the papers filed before us. For example, the complaint uses the spelling "Harkes," but later filings use "Harkis." We have no way of knowing which spellings are correct, so to be consistent, we will adopt the spellings used in the complaint.

4. Boric acid apparently was used to make the cotton fabric fireproof.

5. Ford does not name the doctor, and it is not clear from the complaint whether he saw the same doctor or a different doctor on each visit.

though he received refills on his heart medication, he claims his health problems were otherwise essentially ignored. Ford asserts that each time he visited the doctor, he was told merely that "It's really nothing serious. You'll get over it." *Id.* ¶ 10.

Ford did not get over it, but rather, his health problems seemed to get worse. Ford claims that he lacks any vision in his right eye and has very poor vision in his left. In addition, in 1988 he contracted a kidney infection that, like his vision difficulties and other health problems, he attributes to his work in the unhealthy conditions of the mattress factory. Ford's superiors at the factory finally requested that Ford be given a medical examination, and he received a physical and a number of tests sometime in 1988. Ford claims that he never received the results of these tests, *id.* ¶ 12, but he understands, apparently through the prison grapevine,[6] that the tests indicated his "health profile" was poor. Complaint—Relief ¶ A2. Despite this, someone (it is not clear who) signed an authorization for Ford to return to work.

In August 1988, as a result of his health problems, Ford brought this suit against Fortenbury and Johnston, as well as against IDOC; Michael P. Lane, the Director of IDOC; J.W. Fairman, the Warden at Joliet; Dr. Ronald M. Shanskey, the Medical Doctor for IDOC; and Kathy Harkes, the Health Care Administrator at Joliet. The individual defendants are sued in both their official and their personal capacities. Ford asserts that the defendants are liable under section 1983 because their treatment of him constitutes cruel and unusual punishment under the eighth amendment. Broadly read, Ford's complaint identifies four purported violations of the eighth amendment. First, the defendants failed to give Ford a physical examination before he started his employment at the mattress factory, despite his known health problems and despite the unhealthy conditions at the factory; second, after Ford's health problems became evident, the defendants ignored his complaints; third, when Ford finally received a physical, he

was not informed of its results; fourth, despite the poor results of his physical, Ford was authorized to go back to work. Ford seeks $935,000 in compensatory damages, $2,350,000 in punitive damages and attorneys' fees and costs under 42 U.S.C. § 1988. In addition, Ford asks us to order the defendants to have him examined by medical specialists and to enjoin the defendants from retaliating against him for suit by transferring him to a more onerous prison.

### The Eleventh Amendment

■ The defendants have invoked the eleventh amendment as support for their first attack on Ford's complaint. The defendants correctly argue that the eleventh amendment bars suit in federal court against state agencies, such as IDOC, that have not waived their eleventh amendment immunity. *See Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057, 57 L.Ed.2d 1114 (1978) ("There can be no doubt ... that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to filing of such a suit."); *Riordan v. Kempiners,* 831 F.2d 690, 695 (7th Cir. 1987). Neither Illinois nor IDOC has consented to suits for damages, *see Duckworth v. Franzen,* 780 F.2d 645, 649 (7th Cir.1985), *cert. denied,* 475 U.S. 321, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986), so IDOC must be dismissed from the suit.

■ Defendants also contend that the eleventh amendment bar suits against any of them in their official capacity. This argument presents slightly more difficulty, but only because the case law in this area is maddeningly convoluted. In general, a suit against a defendant in his or her official capacity is "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); *see also Brandon v. Holt,* 469 U.S. 464, 471–73, 105 S.Ct. 873, 877–78, 83 L.Ed.2d 878 (1985); *Conner v. Reinhard,* 847 F.2d 384, 394 (7th

---

**6.** One of Ford's later filings indicate his source is someone who works in the prison infirmary.

Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988). It should follow that when a suit against an entity is barred, a suit against an officer in his or her official capacity is also barred. That is certainly the case when a plaintiff seeks monetary damages. *See Kentucky v. Graham,* 473 U.S. 159, 168–69, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985) (since state could not have been sued for damages, suit against state official was necessarily litigated as a personal capacity action, not an official capacity action); *Brunken v. Lance,* 807 F.2d 1325, 1329 (7th Cir.1986). Since all individual defendants are officials of IDOC and since the eleventh amendment bars suit against IDOC, Ford's suit must be dismissed to the extent that it seeks damages against the individual defendants in their official capacity.

■ However, Ford also asks us to order the defendants to provide him with a medical examination by a specialist and to enjoin the defendants from retaliating against him for bringing this suit. Injunctive relief is clearly barred against the state and state agencies. *See Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984); *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057, 57 L.Ed. 2d 1114 (1978); *Brunken,* 807 F.2d at 1329. If suits against individuals in their official capacity are really just like suits against the entity, then it should follow that injunctive relief suits against state officials should also be barred. However, the Supreme Court long has held that the eleventh amendment does not bar an official capacity suit seeking injunctive relief against a state official, at least if the relief sought is prospective and is based on the unconstitutionality of the official's actions. *See Kentucky v. Graham,* 473 U.S. at 169 n. 18, 105 S.Ct. at 3107 n. 18; *Pennhurst,* 465 U.S. at 102, 104 S.Ct. at 909; *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Therefore, since the suit is based on the eighth amendment and seeks injunctive relief only for the future, the eleventh amendment does not require us to dismiss the portion of Ford's suit seeking injunctive relief against the individual defendants in their official capacity.

■ Ford also seeks something that he calls a "declaratory judgment." The eleventh amendment does not bar declaratory actions against state officials in their official capacities, if the action is grounded in federal law. *Kentucky v. Graham,* 473 U.S. at 169 n. 18, 105 S.Ct. at 3107 n. 18. Ford's suit, however, does not seek a true declaratory judgment. As we have noted elsewhere, the purpose of a declaratory judgment "is to allow the parties to understand their rights and liabilities so that they can adjust their future action to avoid unnecessary damages." *Rockwell International Corp. v. IU International Corp.,* 702 F.Supp. 1384, 1388 (1988) (citing *ACandS Inc. v. Aetna Casualty & Surety Co.,* 666 F.2d 819, 823 (3d Cir.1981)); *see also* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2751 at 570 (2d ed. 1983) (declaratory judgment "permits actual controversies to be settled before they ripen into violations of law"). Here, by contrast, Ford is seeking a declaration that the defendants' past conduct—hiring him without a medical examination and allowing him to return to work after a negative health report—violated the law. This is not a declaratory judgment in the technical sense of that term, but merely the type of declaration that is required in any suit for damages. Accordingly, the declaratory judgment exception does not apply.

### Respondeat Superior

■ As noted previously, Ford has sued the individual defendants in both their official and their personal capacities. Defendants Lane, Foreman, Shanskey and Harkes all contend that we must dismiss Ford's suit against them in their personal capacities because it is improperly based on *respondeat superior.* It is well settled that *respondeat superior* or vicarious liability has no place in a section 1983 case. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036; *Martin v. Tyson,* 845 F.2d 1451, 1455 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988); *Rascon v. Hardiman,* 803 F.2d 269, 274 (7th Cir.

1986). As the Seventh Circuit stated in *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983), "Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." (Emphasis in original).

We conclude, however, that Ford's complaint is not based on *respondeat superior*. Ford does not allege any of the defendants should be liable merely because of the action or inaction of another. Rather, he alleges that each of the defendants should be liable because he or she acted or failed to act in a way that has injured Ford. For example, Ford alleges that Warden Fairman "failed to monitor his responsibility and duty to delegate appropriate medical personnel" and that because of this, Ford did not receive "appropriate medical care for his serious medical needs." Complaint—Statement of Legal Claims ¶ 4.[7] To be sure, his allegations are somewhat conclusory, but they do purport to show the personal involvement of all of the defendants and how their personal involvement harmed Ford.

### Eighth Amendment

Of course, to say that the complaint is not based on *respondeat superior* does not mean that Ford states a claim. "In order to state a cognizable [eighth amendment] claim, a prisoner must allege acts or omissions sufficiently harmful to evidence *deliberate indifference* to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (emphasis added); *see also DeMallory v. Cullen*, 855 F.2d 442, 444 (7th Cir.1988); *Martin v. Tyson*, 845 F.2d at 1458; *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). Negligence, gross negligence or even tort-law recklessness is not enough. *See Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir.1988) (en banc); *Smith–*

*Bey v. Hospital Administrator*, 841 F.2d 751, 759 (7th Cir.1988); *Shockley*, 823 F.2d at 1072; *Duckworth v. Franzen*, 780 F.2d 645, 652–53 (7th Cir.1985), *cert. denied*, 475 U.S. 321, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986).[8] Rather, "the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth*, 780 F.2d at 652; *see also Smith–Bey*, 841 F.2d at 759. Recklessness in the criminal law sense, in turn, requires "an act so dangerous that the defendant's knowledge of the risk can be inferred." *Duckworth*, 780 F.2d at 652; *Archie*, 847 F.2d at 1219.

■ Applying these principles, we conclude that dismissal is clearly mandated for Warden Fairman and Medical Director Shanskey. Ford does not allege that either official knew of his medical condition or had anything to do with his being hired or continuing to work in the mattress factory. Rather, he merely alleges that Fairman "failed to monitor his responsibility and duty to delegate appropriate medical personnel," and that Shanskey "failed to monitor his responsibility and duty of making sure that competent medical personnel was [sic] assigned to [Joliet's] Health Care Unit in order to diagnose and treat [Ford's] serious medical needs." Complaint—Statement of Legal Claims ¶¶ 4, 5. This is insufficient. We note first that the rest of Ford's complaint belies these particular allegations. The complaint indicates that doctors were available to see Ford, and that they did in fact examine him on a number of occasions. Ford may be dissatisfied with the results of these examinations, but the fault, if any, lies with the doctors and not with Fairman and Shanskey. Moreover, even if we accept these particular allegations as true, they at best indicate that Fairman and Shanskey were negligent in supervising the medical per-

---

7. We will consider the allegations against Fairman and the other defendants in more detail below.

8. At least two Seventh Circuit cases seem to suggest that tort-law recklessness is sufficient to meet *Estelle's* "deliberate indifference" standard.

*Richardson v. Penfeld*, 839 F.2d 392, 395 (7th Cir.1988); *Benson v. Cady*, 761 F.2d 335, 339 (7th Cir.1985). However, the most recent cases clearly hold otherwise. *See Archie*, 847 F.2d at 1219; *Smith–Bey*, 841 F.2d at 759.

sonnel who worked for them; negligence, as noted above, is insufficient to give rise to liability under the eighth amendment.

■ Ford's claims against Lane, the Director of IDOC, are likewise insufficient, and we must dismiss him as well. Ford claims that Lane "had 'knowledge' of Ford's serious medical needs," yet failed to act. Such "deliberate indifference" and "gross reckless disregard" resulted in injury to Ford. Complaint—Statement of Legal Claims ¶ 3. Despite the use of the appropriate buzzwords, Ford's claim is still sorely lacking. First, we very seriously doubt that Lane, who is in charge of the entire Illinois prison system, actually knew of Ford's health problems. Indeed, it is likely that Ford does not mean that Lane actually knew. Since Ford put quotation marks around "knowledge" (and continued to do so in his later briefs), he may well have been referring to something like constructive knowledge. Yet, even assuming Lane did know, the complaint indicates that he did everything the eighth amendment requires of a person in his petition. As noted above, medical care was available at Joliet, and the complaint does not allege that Lane prevented Ford from receiving this medical care. On the contrary, Ford visited the doctor on a number of occasions. Perhaps Ford's superiors should have required Ford to visit the doctor before they hired him—a matter we take up shortly—or perhaps the medical care that Ford received was inadequate. But these failings, if that is what they are, cannot be charged to Lane, and Lane's own conduct clearly did not amount to deliberate indifference to prisoners' medical needs. Our conclusion is not changed merely because Ford labels Lane's conduct as deliberate indifference. Although we must accept all of Ford's allegations as true, we need not give any weight to his unsupported conclusions of law. *Gray v. Dane County,* 854 F.2d 179, 182 (7th Cir.1988). Accordingly, Lane must be dismissed.

■ That brings us to the defendants with a more direct role in this case, Fortenbury, Johnston and Harkes. Ford claims that Fortenbury, Johnson and Harkes vio-lated his eighth amendment rights by allowing him to work in the mattress factory without first requiring a physical examination. We conclude that a reasonable jury could not find that the defendants' omissions were "so dangerous that [their] knowledge of the risk can be inferred." *See Duckworth,* 780 F.2d at 652. Their actions, at most, show poor or negligent judgment, and such negligence does not implicate the eighth amendment. As the Supreme Court made clear in *Estelle,* "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind,'" *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292.

■ Ford has also alleged three other purported eighth amendment violations, but none of these can be charged to the defendants. First, Ford claims that each time he visited the prison doctor to complain about his deteriorating health, he was told, "It's really nothing serious. You'll get over it." Complaint—Statement of Facts ¶ 10. This may indicate deliberate indifference, especially if the same doctor saw him each time. But only the doctor or doctors can be faulted for this; the named defendants cannot.

■ Second, Ford asserts that "the defendants" withheld his medical report from him after he finally received a physical examination. We conclude that this allegation fails to state a claim under the eighth amendment. The withheld report, by itself, does not constitute any harm to Ford, so it could not be a punishment, let alone a cruel and unusual one. Nor can we see how the withheld report violates any other constitutional provision. At best, the fact that the report was withheld provides evidence for Ford's claim, discussed and dismissed in the next paragraph, that the defendants showed deliberate indifference to his health when they authorized his return to work, despite the purportedly negative report. It will not, however, support an independent claim.

Third, Ford claims that even though the results of his health examination were

poor, someone authorized him to go back to work in the factory. Without deciding the issue, it appears that this presents a closer question of deliberate indifference. However, since the complaint never indicates who made the authorization, we cannot charge the purported eighth amendment violation to any of the defendants.

 Accordingly, we must dismiss all claims for damages against all defendants. Ford also seeks the items of injunctive relief, but his claims here are equally unavailing. First he asks that we order the defendants to send him to various specialists for examinations, but he has not presented a sufficient case for such an order. Ford admits that in response to his medical complaints, he has received a physical and been given a number of tests, in particular, an "x-ray, blood test, urine specimen, EKG, spirometer test, and general physician's physical." Complaint—Statement of Facts ¶ 12. Ford may desire more, and in the outside world he might choose to get more, but the eighth amendment does not require it. "[T]he question whether an X-ray—or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293. As the Seventh Circuit has held, "The Eighth Amendment guarantees a prisoner treatment of his serious medical needs"—which is what Ford received here—"not a doctor of his own choosing." *United States v. Rovetuso*, 768 F.2d 809, 825 (7th Cir.1985), *cert. denied*, 474 U.S. 1076, 106 S.Ct. 838, 88 L.Ed.2d 809 and 476 U.S. 1106, 106 S.Ct. 1951, 90 L.Ed.2d 360 (1986).

Ford finally asks that we enjoin the defendants from retaliating against him for bringing this suit by ordering a "negative institutional transfer," that is, a transfer to an even worse prison, such as Pontiac, Stateville or Menard. While federal courts generally do not interfere with prison transfer decisions, an exception exists for transfers ordered in retaliation for the exercise of protected constitutional rights. *See Williams v. Faulkner*, 837 F.2d 304, 309 n. 7 (7th Cir.), *cert. granted on other grounds sub nom. Neitzke v. Williams*, —— U.S. ——, 109 S.Ct. 53, 102 L.Ed.2d 32 (1988). However, Ford does not allege that he has been threatened with a transfer, or any other facts which would indicate that a transfer is likely. A court of equity should be particularly reluctant to issue an injunction against a mere possibility or fear as the Seventh Circuit has said, "[I]njunctive relief is not appropriate to present the possible occurrence of an event at some indefinite future time." *Janowski v. International Brotherhood of Teamsters Local No. 710 Pension Fund*, 673 F.2d 931, 940 (7th Cir.1982), *vacated on other grounds*, 463 U.S. 1222, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983); *see also* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2942 at 369–70 (1973). Accordingly, we deny Ford's request for an injunction.[9]

### Conclusion

For the reasons set forth above, the defendants' motion to dismiss is granted without prejudice. Plaintiff Ford is granted leave to amend his complaint within thirty days to cure any of the deficiencies we have indicated. It is so ordered.

---

**9.** Given our resolution of the case, it is unnecessary to consider the qualified immunity issues raised by the defendants.