**Derrick WILLIAMS, Plaintiff,**

v.

**Michael O'LEARY, et al., Defendants.**

**No. 89 C 6455.**

United States District Court,
N.D. Illinois, E.D.

Oct. 27, 1992.

Philander Scott Neville, Jr., Chicago, for plaintiff.

Thomas A. Morrissey, Gregory Abbott, Atty. General's Office, Chicago, for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Derrick Williams, an inmate confined to the custody of the Illinois Department of Corrections, brings this civil rights action against officials at the Joliet Correctional Center ("Joliet") and the Stateville Correctional Center ("Stateville"), alleging inadequate medical care. Defendants Michael O'Leary, James W. Fairman, Arthur Brewer, George Kurian, Leroy Banks and Clyde Nash now move for entry of summary judgment on Williams' complaint. For the reasons set forth below, the motion is granted in part and denied in part.

### I. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). Once the moving party has done this, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991).

Derrick Williams, pro se.

## II. Background

Williams has been incarcerated in the Illinois prison system since January 5, 1988, first at Joliet (until August 22, 1988), and currently at Stateville. During Williams' confinement at Joliet, defendant James W. Fairman presided as warden. Defendant Michael O'Leary was the warden at Stateville from December 1, 1983, to February 1, 1990. From October 3, 1988, Arthur Brewer, M.D. has been the medical director at Stateville. At all relevant times, George Kurian, M.D. was a staff physician at Stateville. Defendant Leroy Banks was a correctional officer at Stateville from 1979 to 1989, at which time he was promoted to sergeant (a position he held until June 1, 1990). Clyde Nash has been a captain at Stateville since approximately 1982.

On January 7, 1986, Williams sustained an injury to his left leg in an automobile accident. On April 25, 1987, his doctor, a Dr. Greenwald, removed from his left leg a metal plate and screws that had been inserted after the accident. At that time, Dr. Greenwald determined that Williams was inflicted with a chronic condition known as osteomyelitis, an infectious inflammation of the bone marrow.

Shortly after entering Joliet in early 1988, Williams underwent an initial physician's examination, which revealed the scar on his left leg, but classified his health as good. During the examination, Williams' left leg was not x-rayed nor was he diagnosed with osteomyelitis. Less than one month after this initial examination, however, an x-ray was taken of Williams' left leg, and a consultation report dated March 3, 1988 from Dr. Greenwald advised Joliet officials that Williams was still suffering from osteomyelitis. Dr. Greenwald instructed officials (1) to give Williams Duricef (an antibiotic) twice a day, (2) to take Williams' temperature each evening, (3) to take Williams' white blood count or differential, and (4) in the event that he developed an unexplained fever, to hospitalize Williams and administer intravenous antibiotics. Dr. Greenwald reiterated his recommendations following a March 17, 1988 ex-amination of Williams. He further advised officials to return Williams to his clinic on April 21, 1988. According to Williams, Joliet officials did not take his temperature each evening nor did they take his white blood count. Further, Joliet officials did not bring Williams back for the April 21 examination, ignoring his requests to see Dr. Greenwald.

On May 5, 1992, after examining Williams and x-raying his left femur, Dr. Greenwald again confirmed that Williams suffered from chronic osteomyelitis, ordering him to be placed in a "low bunk" and to be brought back in three months for another x-ray. Williams' condition degenerated to the point where, on August 4, 1988, he was transferred to Silver Cross Hospital for intravenous antibiotic treatment. A culture gathered on that date revealed that Williams' osteomyelitis was caused by an organism known as pseudomonas aeruginosa. According to the medical report, pseudomonas aeruginosa is susceptible to amikacin, gentamicin, tobramycin and carbenicillin, and is resistant to ampicillin, cefuroxime, tetracycline, trimeth/sulfa, cephaiothin and cefoxitin. While at Silver Cross Hospital, Williams was treated with gentamicin, an antibiotic his culture revealed combatted pseudomonas aeruginosa. Williams was discharged from Silver Cross Hospital on August 15, 1988, at which time Dr. Greenwald instructed prison officials to place Williams in the infirmary and to treat him with an antibiotic called cipro. Upon returning to Joliet, Williams was placed in the segregation unit, and was not treated with cipro.

On approximately August 22, 1988, Williams was transferred from Joliet to Stateville, where likewise he was placed in segregation. Like the Joliet defendants, the Stateville officials did not treat Williams with cipro. Rather, from August of 1988 until November, 1990, Dr. Brewer and Dr. Kurian treated Williams with Duricef, Keflex and Velosef, antibiotics which Williams claims are ineffective against pseudomonas aeruginosa. As a result of inappropriate medication over this two-year period, Williams suffered pain and swelling in his left leg. On May 8, 1990, after

examining Williams on that day, Dr. Brewer sent a letter of consultation to the University of Illinois Hospital. Williams was sent to the University of Illinois Hospital for antibiotic treatment on August 15, 1990, October 24, 1990, and November 14, 1990. On December 4, 1990, doctors at the University of Illinois Hospital performed debrisment surgery on Williams. The last date on which Williams was prescribed antibiotics for his osteomyelitis was January 14, 1991. Since the debrisment surgery, Williams has had no significant problems with his left leg.

### III.  Discussion

Williams' second-amended complaint alleges that he was deprived of adequate medical care while incarcerated at Joliet from January 5, 1988 to August 22, 1988 (Count I), and while confined at Stateville since August 22, 1988 (Count II). The gravamen of the specific contentions asserted against each movant is as follows. Williams claims that Dr. Brewer and Dr. Kurian, his treating physicians at Stateville, violated his Fifth, Eighth and Fourteenth Amendment rights by their persistent failure to follow Dr. Greenwald's treatment instructions. Specifically, they did not place Williams in the infirmary and, instead of administering the antibiotic prescribed by Dr. Greenwald (cipro), from August, 1988, to November of 1990, they treated Williams with antibiotics that are ineffective against pseudomonas aeruginosa. Second, Williams maintains that Nash's liability stems from his failure to assign Williams to a "low gallery" cell.[1] Third, Williams asserts that defendant Banks interfered with Williams' attempts to obtain medical attention by refusing to take him to the emergency room. Finally, regarding Wardens Fairman and O'Leary, Williams claims that they were obligated by law to ensure that Williams received appropriate medical attention and, in that he did not, Fairman and O'Leary breached a statutory duty and must be held personally accountable. We address the propriety of the claims against each group of defendants seriately.

### A.  Doctors Brewer and Kurian

■■ To survive the instant motion for summary judgment filed by his treating physicians, Williams must demonstrate "deliberate indifference to [his] serious medical needs," on the part of Dr. Brewer and Dr. Kurian. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). The task of defining the phrase "deliberate indifference," an oxymoron, has not been without equivocation. Nonetheless, the following general principles have emerged. Simple negligence, gross negligence or even recklessness as the term is used in tort cases is insufficient to establish deliberate indifference. *Wilson v. Seiter*, —— U.S. ——, ——, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991); *McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992); *Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir.1988) (en banc), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989); *Smith–Bey v. Hosp. Adm'r*, 841 F.2d 751, 759 (7th Cir.1988); *Duckworth v. Franzen*, 780 F.2d 645, 652–53 (7th Cir. 1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). Rather, "the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth*, 780 F.2d at 652; *see also McGill*, 944 F.2d at 348; *Smith–Bey*, 841 F.2d at 759. Recklessness in the criminal law sense, in turn, requires a subjective inquiry into the defendant's mental state. *Wilson*, —— U.S. at ——, 111 S.Ct. at 2324–25; *McGill*, 944 F.2d at 348. In other words, liability cannot be predicated on an objective consideration of what a defendant "should have known." *McGill*, 944 F.2d at 348; *Steading v. Thompson*, 941 F.2d 498, 499–500 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1206, 117 L.Ed.2d 445 (1992).

---

**1.** The term "gallery" refers to a floor of cells. Inmates at Stateville are assigned to one of four galleries.

■ There is no dispute that neither Dr. Brewer nor Dr. Kurian intended to harm Williams or deprive him of effective medical care. As such, our focus rests on whether Williams has set forth facts sufficient to infer criminal recklessness. We conclude that he has. Courts traditionally infer criminal recklessness with a view towards the dangerousness of the conduct and the societal costs to avoiding such action:

> A classic example is where the defendant chokes his victim, intending to injure him seriously but not to kill him, but death results. The defendant has deliberately committed an act that is at once socially costless to avoid (by not choking his victim in the first place) and highly dangerous. So he is severely punished, for an act that was deliberate and wrongful as well as for a consequence that was lethal though unintended. As this example suggests, recklessness in criminal law implies an act so dangerous that the defendant's knowledge of risk can be inferred.

*Duckworth*, 780 F.2d at 652 (citations omitted). Traditional notions of criminal recklessness, however, are not easily applied to actions alleging inadequate medical care. The conduct of Dr. Brewer and Dr. Kurian clearly cannot be compared to the act of choking a fellow human being, as depicted in the above example of criminal recklessness. Indeed, it is axiomatic that providing treatment for a diagnosed malady is neither inherently dangerous nor without social value. Given this difficulty in applying traditional notions of criminal recklessness in medical care cases, "courts have begun to recognize that repeated, long-term negligent treatment of a prisoner's medical condition, rather than intentional actions, may amount to deliberate indifference to serious medical needs under certain circumstances." *Diaz v. Broglin*, 781 F.Supp. 566, 574 (N.D.Ind.1991); *see Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir.1990); *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir.1983), *cert. denied*, 468 U.S. 1217,

104 S.Ct. 3587, 82 L.Ed.2d 885 (1984); *see also Wilson*, —— U.S. at ——, 111 S.Ct. at 2325 ("The long duration of a cruel prison condition may make it easier to *establish* knowledge and hence some form of intent....") (emphasis in original).

■ To be sure, Dr. Brewer and Dr. Kurian prescribed Duricef, Keflex and Velosef to combat Williams' osteomyelitis, as opposed to cipro (as ordered by Dr. Greenwald, Williams' primary physician) or one of the four antibiotics which Williams' culture revealed to be effective against pseudomonas aeruginosa. Assuming that Dr. Brewer and Dr. Kurian's actions, at most, amounted to "mere negligence" or "malpractice," the duration of this negligent treatment is sufficient for this court to infer "criminal recklessness," or "deliberate indifference." In total, Williams was examined by physicians at Stateville on 42 separate occasions between August, 1988, and December 31, 1990. Additionally, during that 28–month period, Williams received 29 written prescriptions for medication to combat his osteomyelitis. As a result of the ineffectiveness of each medication, Williams lived in pain for over 2 years, his left leg swelling and requiring draining. Mere volume of medical attention is insufficient to defeat an Eighth Amendment claim. The unrebutted facts set forth by Williams reveal a significant probability of long-term negligent care and, when coupled with the defiance of explicit orders by Williams' primary physician,[2] dictate that we afford Williams the opportunity to present to a jury his claims against Dr. Brewer and Dr. Kurian. *See Martinez v. Mancusi*, 443 F.2d 921, 924 (2d Cir.1970), *cert. denied*, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971). Accordingly, we deny defendants' motion for summary judgment as it relates to Williams' claims against Dr. Brewer and Dr. Kurian.

### B. Captain Nash

■ In support of his motion for summary judgment, defendant Nash contends

---

**2.** Despite our explicit invitation, *see Williams v. Lane*, No. 89–6455, slip op. at 3 1992 WL 67858 (N.D.Ill. Mar. 20, 1992), defendants do not claim

that they were unaware of Dr. Greenwald's reports, nor do they contend that they possessed no knowledge of the contents of those reports.

that he was merely a security officer at Stateville and, hence, his duties did not include "diagnosing medical problems, determining dates of medical care, ... prescribing medication to inmates.... [or determining] access to medical care...." To the extent that Nash implies that only medical staff can be deliberately indifferent to a prisoners serious medical needs, he is mistaken. It is settled law that "deliberate indifference" can be "manifested by ... prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. As captain of Williams' cell house from 1988 to 1991, Nash bore responsibility over "inmate residence assignments." *See* Williams' Affidavit, Exhibit 15H, ¶ 2 (Illinois Department of Personnel, Position Description). Mindful of Williams' medical problem, Dr. Brewer requested in letters dated March 12, 1991, and August 1, 1991, that Williams be housed in a low gallery (first or second floor). Williams' Affidavit, Exhibits 10D, 10E. The Stateville defendants acknowledge that from August of 1988 until January, 1991, Williams' was not transferred to a low gallery. Williams' Affidavit, Exhibit 7, ¶ 36 (Defendants' Answer to Plaintiff's Request to Admit Facts). Significantly, Nash does not contest the fact that he was aware (1) that Williams had a serious medical problem, and (2) that Dr. Brewer requested he be moved to a low gallery. The unrebutted submissions proffered by Williams establish a genuine issue of material fact as to whether Nash intentionally interfered with Dr. Brewer's treatment of Williams and, as such, Nash's motion for summary judgment is denied. *See Patrick v. Staples,* 780 F.Supp. 1528, 1544 (N.D.Ind.1991) (refusal to provide plaintiff with a bottom bunk after being advised that he "had pain climbing to a top bunk" sufficient to implicate the Eighth Amendment).

### C. Sergeant Banks

■ The gist of Williams' allegations against defendant Banks is simply that he refused to take Williams to the emergency room upon request. As previously stated, Banks was a correctional officer at Stateville who was promoted to sergeant during the relevant time frame. As a correctional officer, Banks' duties included patrolling inmate living areas and monitoring inmate movement. Banks' Affidavit ¶ 2, at 1. As a sergeant, Banks' duties include the oversight of correctional officers in performing their security functions. *Id.* ¶ 3, at 1. Williams has alleged, and Banks has not denied, that on four or five occasions Williams asked Banks to take him to the emergency room because of pain in his left leg. Further, there is no dispute that Banks did not take Williams to either the emergency room or the health care unit.

Whether Banks intentionally denied or delayed Williams access to medical care turns on the factual question of whether Williams required emergency care at the time of his requests. Indeed, as Banks contends, applicable regulations provide that an inmate may be moved to the emergency room or the health unit only with prior approval by a medical staff member and only with a written pass. Brewer Affidavit ¶ 7, at 2. And, without a prior appointment and a written pass, and in the absence of a need for emergency care, prisoners in segregation, such as Williams, are afforded access to a Correctional Medical Technician ("CMT") who, in turn, determines if the inmate needs to go to the health care unit or the emergency room for treatment. *Id.* ¶ 8, at 2. To be sure, in such a non-emergency situation, the regulations do not charge a corrections officer performing security work with the responsibility of ensuring that the inmate seeks the assistance of the CMT. However, the regulations are specific in the event that the prisoner requires emergency care:

> [w]hen an employee becomes aware of a health related emergency, he/she or the supervisor must contact the available CMT or radio for K3–91 (emergency CMT). If the K3–91 does not respond the employee or supervisor must telephone the Emergency Room and the supervising nurse will dispatch assistance. She will advise the Shift Supervisor of

any back-up assistance needed from the Emergency Response Team. Brewer Deposition, Exhibits 2B–2D (Institutional Directive, Health Care Services for Inmates). Accordingly, if Williams required emergency care at the time of his requests and such need was apparent to Banks, we could properly infer deliberate indifference on the part of Banks provided he did not contact the CMT on duty. These are questions of fact properly left for a jury, and Banks' motion for summary judgment is denied.

### D. Wardens Fairman and O'Leary

Respecting Wardens Fairman and O'Leary, the crux of defendants' argument in support of summary judgment is that neither warden had the personal involvement necessary to be held liable under 42 U.S.C. § 1983. Indeed, a defendant sued in his individual capacity can only be held liable under § 1983 for his individual wrongdoing. *Rascon v. Hardiman,* 803 F.2d 269, 273 (7th Cir.1986); *Duckworth,* 780 F.2d at 650. As stated in *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir. 1983): "Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional violation." Thus, § 1983 does not recognize the doctrine of superiors' liability, *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1390 (7th Cir.1984), or the doctrine of respondeat superior. *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

Williams, however, does not seek to hold wardens Fairman and O'Leary liable by virtue of the acts of their employees. Rather Williams contends that the wardens were charged by law to provide adequate medical services and that they personally breached that duty. Indeed, under appropriate circumstances, supervisory personnel with the power and duty to ensure adequate medical care may be held liable under § 1983 for breaches of their legal obligations resulting in constitutional violations. *See Hill v. Marshall,* 962 F.2d 1209, 1213 (6th Cir.1992); *Miranda v. Munoz,* 770 F.2d 255, 260–61 (1st Cir.1985); *see also Ford v. Lane,* 714 F.Supp. 310, 315 (N.D.Ill.1989) (allegations that Warden Fairman "failed to monitor his responsibility and duty to delegate appropriate medical personnel" sufficient to show personal involvement). Nonetheless, assuming that Ill.Rev.Stat. ch. 38, ¶ 1003–2–2(a), (r) (Supp. 1992), and the consent decree entered in *Cook v. Rowe,* (No. 76–2224, N.D.Ill.), support Williams' contention that Fairman and O'Leary were obligated by law to provide adequate medical care, their failure to do so in the instant case cannot be considered anything more than simple negligence. Significantly, Williams does not contend that either Fairman or O'Leary (unlike Drs. Brewer and Kurian) possessed personal knowledge of his medical condition. As such, despite the personal obligations on the part of the wardens, Williams' Eighth Amendment claims against Fairman and O'Leary cannot stand. *See Ford,* 714 F.Supp. at 315–16 (although plaintiff's complaint reveals personal involvement on the part of Warden Fairman, absence of personal knowledge of plaintiff's medical condition precludes recovery under Eighth Amendment). Accordingly, defendants' motion for summary judgment as it relates to Wardens Fairman and O'Leary is granted.

### IV. Conclusion

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part. It is so ordered.