Norwood L. WHITE, Individually and on Behalf of Others Similarly Situated,

v.

John J. NAPOLEON.

Appeal of Norwood L. WHITE, Daniel Sabb, Emilio Baez Nazario and Calvin Merle Rogers.

No. 89–5523.

United States Court of Appeals, Third Circuit.

Argued Oct. 17, 1989.

Decided Feb. 23, 1990.

Fredric J. Gross (argued), Mount Ephraim, N.J., for appellants.

Ronald L. Bollheimer (argued), Deputy Atty. Gen., Peter N. Perretti, Jr., Atty. Gen. of New Jersey, Trenton, N.J., for appellee.

Before BECKER, COWEN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

Norwood L. White, Emilio Baez Nazario, Calvin Merle Rogers and Daniel Sabb appeal from an order of the district court dismissing their complaint pursuant to Fed. R.Civ.P. 12(b)(6). We will reverse in part and affirm in part.

### I.

White, Nazario, Rogers and Sabb are prisoners within the New Jersey prison system. On October 18, 1988, White filed a complaint against John J. Napoleon, a prison physician, on behalf of himself and others similarly situated. The complaint alleged that Dr. Napoleon had mistreated White and other prisoners so as to violate the Eighth Amendment, the Fourteenth Amendment and various provisions of state law. White sought to enjoin Dr. Napoleon from continuing to treat prisoners in the New Jersey prison system and to obtain damages for injuries suffered as a result of Dr. Napoleon's conduct. The action was

predicated on 42 U.S.C. § 1983 and provisions of state law.

White moved for preliminary injunctive relief and for certification of the plaintiff class. Dr. Napoleon moved for summary judgment. The district court denied preliminary relief and dismissed without prejudice the motions for class certification and summary judgment.

Thereafter, White filed an amended complaint. It reiterated White's allegations and added new allegations by additional plaintiffs Nazario, Rogers and Sabb. The amended complaint is extremely factually detailed, containing 162 paragraphs.

Dr. Napoleon moved to dismiss the amended complaint pursuant to Fed.R. Civ.P. 12(b)(6). By order dated June 7, 1989, the district court granted the motion to dismiss. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1982).

## II.

Since Dr. Napoleon filed no answer and the dismissal was solely on the basis of the facts alleged, we look only to the facts alleged by appellants to determine whether dismissal was warranted. The allegations of the amended complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the appellants. *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir.1987).

### A.

White alleges he has suffered from a chronic, painful ear infection since 1977. Prison physicians first attempted to treat the infection with ear drops, antibiotics and frequent cleaning. None of the treatments was effective and those that required putting liquid in the ear caused extreme pain. Eventually, the Department of Corrections retained a specialist, who instructed White to avoid getting water in his ears while taking showers. When White experienced itching, a rash or flaking tissue, White would be given Valisone ointment. This method successfully controlled White's ear infection for years.

When White was transferred to Bayside State Prison, Dr. Napoleon conducted an intake interview. White explained that the Valisone he had been given at his previous place of incarceration had been confiscated. He asked that the doctor leave standing orders to treat White's ear with Valisone. Without examining White or reviewing his medical records, Dr. Napoleon said he would not let plaintiff have Valisone and that "they only gave it to you there to shut you up," or words to that effect. After that, White's ear infection became active and uncontrolled, causing him pain and loss of hearing.

Dr. Napoleon continued refusing to administer Valisone. Instead, he insisted on trying each of the treatments that had proven unsuccessful and painful before. When White protested that his prior doctors had tried these methods without success, Dr. Napoleon responded that he would see for himself. He continued to order frequent washing of White's ear, although it caused White great pain and was contraindicated by his prior medical history.

On one occasion, Dr. Napoleon said he was going to treat White's ear with Debrox. Debrox is a mild cleansing solution, but White, who is allergic to penicillin, feared Debrox might contain penicillin and asked to read the label. The doctor explained the solution would clean the ear and refused to let White know the ingredients. Dr. Napoleon stated that White would have to accept treatment with Debrox or receive no treatment at all. Because Dr. Napoleon refused to let him know the ingredients, White refused to be treated with Debrox.

Dr. Napoleon filed disciplinary charges against White for refusing to cooperate in a prescribed course of treatment. White was acquitted of the charges after a prison courtline hearing.[1]

---

1. "Courtline" is a word used throughout the amended complaint. From the pleadings and the context in which it is used, we understand that it refers to the disciplinary hearing held in prison.

As time passed, the hearing loss and pain in his ear increased, so that White eventually agreed to treatment with Debrox. White alleges that Dr. Napoleon left the solution in White's ear for forty minutes, far longer than sound medical practice contemplates, for the express purpose of inflicting pain. The treatment was, in fact, extremely painful. The amended complaint further alleges that Dr. Napoleon refuses to allow White to see a specialist in order to continue to inflict pain and conceal his own misconduct.

### B.

Emilio Baez Nazario has suffered epileptic seizures since 1970. Until he came under Dr. Napoleon's care, he received Epitol, which limited the frequency of seizures to at most three times in a year. When he was transferred to Bayside State Prison, Dr. Napoleon told Nazario that the prison did not use Epitol and prescribed Dilantin instead.

In the following nine months, Nazario alleges he suffered dozens of seizures, many far more severe than those he experienced with Epitol. Nazario also alleges that Dilantin gave him a distressing narcotic high, made him nervous and caused his hands to shake. Nazario reported these unsatisfactory results to Dr. Napoleon and requested Epitol. Dr. Napoleon refused, continued Nazario on Dilantin and in addition prescribed phenobarbital. Nazario continues to have frequent epileptic seizures and Dr. Napoleon continues to refuse to provide Epitol. Nazario alleges that Dr. Napoleon deliberately refuses to treat him with Epitol, knowingly causing him needless suffering from seizures and the resultant pain and risk of physical injury.

### C.

Calvin Merle Rogers suffers from recurrent growths just below the skin. The growths sometimes intrude into muscle tissue, causing pain during flexion. In 1986, one of the growths was surgically removed from his back because of the pain it was causing.

Since Rogers arrived at Bayside State Prison, he has complained to Dr. Napoleon about these growths. In particular, Rogers has one growth near the base of his spine that makes prolonged sitting painful. Another growth in his arm causes Rogers pain at his work assignment, which involves heavy lifting.

The growths cause at most a slight swelling of the skin, and consequently are not obvious to the eye. The growths, however, are readily apparent upon palpation. Rogers alleges that Dr. Napoleon insists he cannot see the growths and refuses to palpate the affected areas. Consequently Dr. Napoleon refuses to give Rogers any treatment for the growths and will not order a change to work that does not involve lifting. Rogers alleges that Dr. Napoleon's actions reflect a deliberate, intentional and sadistic refusal to treat his serious medical needs.

Rogers also has numerous skin blemishes, some of which change color from red to brown over time. He is afraid they may be cancerous or pre-cancerous. Rogers asked Dr. Napoleon to examine the blemishes. Without anything more than a very casual look, Dr. Napoleon said, "I don't do cosmetic surgery," or words to that effect. Dr. Napoleon's actions, Rogers alleges, have caused him to suffer emotional distress, prevented him from making informed decisions about his own medical welfare and may put him at increased risk of cancer.

### D.

Daniel Sabb has a history of carbunculosis on his buttocks and legs. The condition first appeared in late 1985, when he was sent to St. Francis Hospital in Trenton to have a severe boil lanced. During the next year and one half, Sabb's condition grew worse and the carbuncles spread. Treatment by the prison dermatologist, including antibiotics, did not help. In October 1987, Sabb spent one month at St. Francis Hospital's State Prison Ward, where he was tested and had more than fifty carbuncles lanced. St. Francis physicians concluded that Sabb had an exotic condition and obtained permission to have him transferred

to the hospital at the University of Medicine and Dentistry in Newark, New Jersey. There an immunologist, Dr. Beilory, treated Sabb's condition with Tolectin and Maalox, the latter a precaution against the substantial risk of peptic ulcer associated with Tolectin. Beilory's prescription specified "no substitution" for Tolectin.

Sabb was returned to Bayside, then transferred to a halfway house and then Northern State Prison. At each of the latter institutions, he received Tolectin and Maalox. Thereafter, he was returned to Bayside State Prison and came under Dr. Napoleon's care. He sought Tolectin from Dr. Napoleon and explained the history of his problem and its treatment. The doctor told Sabb that Tolectin was not available and would not be ordered. Notwithstanding the specialist Beilory's "no substitution" order, Dr. Napoleon nevertheless substituted a different medication, Anaprox.

On January 6, 1989, Sabb saw Dr. Beilory for a monthly visit and explained that Dr. Napoleon was substituting Anaprox for Tolectin. Dr. Beilory called the Bayside infirmary, spoke to a physician other than Dr. Napoleon, explained that Sabb must receive Tolectin and obtained a promise that it would be ordered. On or about January 10, Dr. Napoleon put the order for Tolectin on hold and had Sabb scheduled for an appointment with him. On January 11, Dr. Napoleon informed Sabb that he would continue to substitute Anaprox for Tolectin. Sabb then "prevailed on third parties to intercede," in what manner is unclear, in order to obtain Tolectin. Dr. Napoleon then agreed to give Sabb Tolectin, but refused to give him Maalox, as Dr. Beilory prescribed. Sabb alleges that Dr. Napoleon's sadistic and deliberate indifference to his serious medical needs has caused him needless anxiety, recklessly interfered with a specialist-prescribed regimen and intentionally and needlessly put him at a substantially increased risk of peptic ulcer.

### E.

The amended complaint also contains allegations regarding unnamed class members. It is alleged, for example, that one prisoner complained he could not feel anything in his hands; that Dr. Napoleon had the prisoner hold his hands behind his back and lit a book of matches to them. The resulting burns were allegedly too severe to be treated at Bayside.

It is alleged that one of Dr. Napoleon's patients arrived at Bayside with a recommendation from a physician at the Metropolitan Correctional Center in New York that an inguinal hernia be repaired without delay. The patient told Dr. Napoleon of his need for surgery upon arrival, but Dr. Napoleon, without even palpating the abdomen, stated he could find no hernia and dismissed the patient. Another physician examined the patient later and, finding a very severe hernia, ordered immediate surgery.

Another patient allegedly suffered from severe impetigo for eight months without close examination, laboratory testing or effective treatment. Dr. Napoleon told the prisoner his problems were "all in your head." The prisoner was transferred to another facility that promptly refused to accept him because of his impetigo.

Dr. Napoleon allegedly has withheld medication needed to control a prisoner's blood pressure for no medical reason whatsoever.

The doctor allegedly has refused decongestants to a prisoner with severe sinus problems, taunting him with suggestions to "blow your nose" and "move to Arizona."

He has allegedly denied any medication except Tylenol to a prisoner with emphysema and arthritis.

Dr. Napoleon allegedly refused a prisoner hospitalization following a heart attack.

### III.

Mere medical malpractice cannot give rise to a violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Only "unnecessary and wanton infliction of pain," *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49

L.Ed.2d 859 (1976)) or "deliberate indifference to the serious medical needs" of prisoners, *id.*, are sufficiently egregious to rise to the level of a constitutional violation.

■ What separates this complaint from ordinary allegations of medical malpractice are (1) allegations that the doctor intended to inflict pain on prisoners without any medical justification and (2) the sheer number of specific instances in which the doctor allegedly insisted on continuing courses of treatment that the doctor knew were painful, ineffective or entailed substantial risk of serious harm to the prisoners.

White, for example, specifically alleges that when he finally agreed to treatment with Debrox, Dr. Napoleon left Debrox in White's ear for forty minutes, "maliciously, and for the purpose of causing [White] pain." He alleges there was no medical justification for using Debrox in this manner. It is also alleged that one prisoner complained he could not feel anything in his hands; that Napoleon had the prisoner hold his hands behind his back and lit a book of matches to them, causing severe burns. These allegations, if true, would show that Dr. Napoleon has wantonly inflicted unnecessary pain on prisoners, in violation of the Eighth Amendment.

Other allegations would demonstrate that Dr. Napoleon was deliberately indifferent to prisoners' serious medical needs. Sabb, for example, alleges that Dr. Napoleon refuses to provide him with Maalox, intentionally and needlessly putting him at a substantially increased risk of peptic ulcer. Taking as true the allegation that Sabb's risk of peptic ulcer is substantially increased, the alleged conduct is sufficient to show a deliberate indifference to serious medical needs. Deliberate indifference may be demonstrated as well by allegations that Dr. Napoleon refused a prisoner hospitalization following a heart attack and withheld medication needed to control a prisoner's blood pressure for no medical reason.

The amended complaint alleges many instances of medical misconduct. Although "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or 'to be repugnant to the conscience of mankind,'" *Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 291–92, the amended complaint does not allege a mere isolated episode of inadvertence, but persistent conduct in the face of resultant pain and risk of permanent injury. From this one reasonably may infer that the doctor is either intentionally inflicting pain on the prisoners or is deliberately indifferent to their medical needs. *See Bishop v. Stoneman*, 508 F.2d 1224, 1226 (2d Cir.1974). We find this sufficient to state a violation of the Eighth Amendment and a concomitant right to relief under 42 U.S.C. § 1983.

Of course, the prisoners may have insufficient evidence to show the doctor intended to inflict pain or was deliberately indifferent to their needs. The doctor may come forward with evidence to the contrary. All we hold at this juncture is that the plaintiffs have made the bare showing in the allegations of the amended complaint required to survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6).

White, Nazario and Sabb advance another theory supporting their claims of cruel and unusual punishment. They rely on *Martinez v. Mancusi*, 443 F.2d 921 (2d Cir.1970), which held that prison authorities and prison doctors violate the Eighth Amendment when they deliberately ignore the express orders of a prisoner's prior physician. The Supreme Court cited *Martinez* with approval in *Estelle v. Gamble:*

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoners' needs, [citing cases] or by prison guards in intentionally denying or delaying access to medical care [citing cases] or *intentionally interfering with the treatment once prescribed.* [citing *Martinez*]

*Estelle*, 429 U.S. at 104, 97 S.Ct. at 291 (citations omitted, emphasis added). Intentional interference with prescribed treatment, as in *Martinez*, is thus one of several

methods of showing deliberate indifference to serious medical needs. To some degree, this appears to conflict with the well-established rule that mere disagreements over medical judgment do not state Eighth Amendment claims. *See Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977); *Massey v. Hutto,* 545 F.2d 45, 46 (8th Cir.1976); *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867–68 (2d Cir.1970). If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a *doctor* disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness.

*Martinez* was not a case of mere disagreement over acceptable treatment. The plaintiff and prisoner, Martinez, suffered infantile paralysis of his right leg. He underwent surgery on the leg in 1969. The surgeons who performed the operation directed that for the operation to succeed, the prisoner must remain flat on his back, move the leg as little as possible and be given demerol and morphine as long as he was in pain. Shortly after the operation, the prison warden ordered Martinez transferred back to prison. Guards removed him from the hospital without obtaining a discharge, forcing him to walk out in handcuffs. He was taken to the prison hospital, where a prison doctor discharged him after one day. Martinez was given nothing for his pain and was forced to move his leg and stand up to receive meals, with the result that the operation failed. The Court of Appeals for the Second Circuit held the complaint stated a cause of action under the Eighth Amendment and section 1983:

> The alleged conduct of the prison authorities in removing him from the hospital before he was ready to be moved, despite the surgeons' orders and without obtaining a discharge, was more than "mere negligence." If proven, it would constitute deliberate indifference to, and defiance of, the express instructions of the operating surgeons and the hospital attendants.

*Martinez,* 443 F.2d at 924. The court repeated that "deliberate indifference to, and defiance of, explicit medical instructions, resulting in serious and obvious injuries" stated a violation of constitutional rights. 443 F.2d at 925.

Not all plaintiffs here allege facts analogous to the *Martinez* case. For example, by itself, Dr. Napoleon's decision to give Nazario Dilantin instead of Epitol is not actionable. The amended complaint does not allege that a prior doctor ordered treatment with Epitol exclusively, or that the prior doctor indicated Nazario's treatment would fail if Epitol was withheld. What may state a cause of action is Dr. Napoleon's persistence in using Dilantin, or Dilantin plus phenobarbital, after Nazario told him that his seizures had increased in violence and frequency. A jury might conclude from this that Napoleon is indifferent to Nazario's serious medical needs.

Whether White states a claim for deliberate indifference in accordance with *Martinez* is a close question. White does not allege that his prior physician ordered Valisone, exclusively, for White's ear condition. He does not allege that the doctor found White's treatment would fail if Valisone was withheld. He does allege, however, that Valisone was the only treatment that in fact was effective; that the treatments tried by Dr. Napoleon had failed in the past and succeeded only in inflicting pain. Dr. Napoleon may have had valid medical reasons for trying the treatments that had failed before. The amended complaint, however, fairly read, alleges he had no such reasons. Taking all inferences in the light most favorable to White, we conclude that White states a claim of deliberate indifference to serious medical needs in accordance with *Martinez* and *Estelle.* It must be emphasized, however, that Dr. Napoleon may not be held liable if he attempted ear washing because, in his judgment, White would benefit. If the doctor's judgment is ultimately shown to be mistaken, at most what would be proved is medical malpractice, not an Eighth Amendment violation. As noted earlier in the opinion, however, White clearly has a cause of action

under the Eighth Amendment based on allegations that Napoleon used Debrox solely to inflict pain and for no valid medical purpose.

■ Sabb's allegations, in some ways, most closely approximate the facts of *Martinez.* According to the amended complaint, Dr. Napoleon deliberately and arbitrarily refused to give Sabb Tolectin for his recurrent boils, despite Dr. Beilory's express order of "no substitution." Dr. Napoleon substituted Anaprox. Sabb's allegations squarely fall within the cause of action alleged in paragraph 153(d) of the amended complaint:

> Napoleon ... arbitrarily and maliciously or recklessly interfer[ed] with modalities of treatment prescribed by other physicians, including specialists, even though these modalities of treatment had proven satisfactory....

The amended complaint, fairly read, suggests that the doctor deliberately treated Sabb with an inappropriate drug for no valid reason. This is sufficient to state a claim for deliberate indifference to serious medical needs. The amended complaint does not allege that the boils grew worse as a result; it does allege, however, that Sabb suffered anxiety. We are not prepared to hold that inflicting mental anxiety alone cannot constitute cruel and unusual punishment. *Cf. Rhodes v. Robinson,* 612 F.2d 766, 772 (3d Cir.1976) (stating in dictum, "we cannot find [plaintiff's] claim insufficient because it alleges emotional rather than physical harm. Emotional distress can produce injury of the same severe magnitude as occurred in cases of physical harm...."). Sabb's allegations are sufficient to state a claim under the Eighth Amendment. What damages, if any, flow from the alleged conduct is an issue for later proceedings. As noted above, Sabb also has a cause of action under the Eighth Amendment based on allegations that Dr. Napoleon intentionally and needlessly exposed him to a risk of peptic ulcer by refusing to provide Maalox.

## IV.

The district court dismissed a separate claim arising from the filing of disciplinary charges. The amended complaint alleges that Dr. Napoleon filed charges against White for refusing treatment for his ear infection. According to the amended complaint, when Dr. Napoleon first proposed treatment with Debrox ear drops, White "refused to be treated with Debrox because [Dr.] Napoleon would neither tell him its ingredients nor let him see the label." Amended Complaint ¶ 45. White alleges he is allergic to penicillin and that he feared Debrox contained that drug. He alleges that Dr. Napoleon arbitrarily refused to tell him the ingredients of Debrox, knowing that White had "an absolute right to make informed decisions as to whether to accept or reject any particular medical treatment." He alleges that Napoleon filed disciplinary charges against him in retaliation for exercising his right to refuse treatment. He further alleges Dr. Napoleon did so maliciously and in order to chill other prisoners' right to refuse treatment.

The district court treated White's claim as one based on procedural due process. Noting that White had been exonerated of the disciplinary charges filed by Dr. Napoleon at a prison courtline hearing, the district court reasoned that White had received all the process due and, thus, stated no violation of rights secured by the Constitution.

■ The district court erred in failing to consider the further issue of White's substantive due process right to be free from retaliation for exercising his constitutional right to be informed of the treatment he was about to receive. The Due Process clause of the Fourteenth Amendment substantively protects certain fundamental rights. Among these are the right to be free from unjustified intrusions into the body, *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977), the related right to refuse unwanted medical treatment, *Rennie v. Klein,* 653 F.2d 836, 844 (3d Cir.1981), and, as we decide today, the right to sufficient information to intelligently exercise those rights. Retaliation for the exercise of constitutionally protected rights is itself a vio-

**112**

lation of rights secured by the Constitution actionable under section 1983. *Cf. Millhouse v. Carlson*, 652 F.2d 371, 373–74 (3d Cir.1981) (retaliation for exercising right to petition for redress of grievances states a cause of action for damages arising under the constitution).

To succeed in a retaliation claim, White must allege that Dr. Napoleon retaliated against him for exercising a constitutionally protected right. White claims a right to know the ingredients of a medication proposed for use in his treatment and a constitutional right to refuse treatment if he is not properly informed. The claim raises several questions that have not previously been addressed.

In *Rennie v. Klein*, 653 F.2d 836, 843–44 (3d Cir.1981), *remanded*, 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), *on remand*, 720 F.2d 266 (3d Cir.1983), we recognized that persons who have been involuntarily committed to a mental institution have a qualified right to refuse anti-psychotic medication. The right is protected substantively by the Due Process clause of the Fourteenth Amendment. It is derived from each person's fundamental right to be free from unjustified intrusions on personal security. *Rennie v. Klein*, 653 F.2d at 844. Other Courts of Appeals have acknowledged the existence of a constitutional right to refuse treatment, although they differ on the source of the right. *See United States v. Watson*, 893 F.2d 970 (8th Cir.1990); *United States v. Charters*, 829 F.2d 479, 487–94 (4th Cir.1987), *rehearing en banc*, 863 F.2d 302, 305–06 (1988) (due process right of person involuntarily committed to mental hospital); *Bee v. Greaves*, 744 F.2d 1387, 1392–94 (10th Cir.) (pre-trial detainee suffering from schizophrenia has a due process right to refuse treatment with anti-psychotic drugs), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1984). *Rennie* recognized, however, that a mental patient's right to refuse treatment is not absolute. The State, as part of its police power, has a strong interest in protecting society against those who

are dangerous to themselves or others. It also has an interest, as *parens patriae*, in protecting a citizen's interests when the citizen is incapable of protecting those interests himself. *Rennie*, 720 F.2d at 273 (Seitz, C.J. concurring). These interests justify involuntary commitment of incompetent or dangerous persons. They also justify treatment of committed persons. *Id.* The *Rennie* court recognized, in consonance with the Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307, 322–23, 102 S.Ct. 2452, 2461–62, 73 L.Ed.2d 28 (1982), that decisions about the proper course of treatment for the mentally ill are complex ones requiring the professional judgment of the institution's staff. *Rennie*, 720 F.2d at 273 (Seitz, C.J. concurring). In balancing the individual's interest in personal security against the State's interest in protecting the patient, his fellow patients and society at large, our Court adopted the following standard: authorities may administer anti-psychotic drugs to an unwilling patient only where the decision is a product of the authorities' professional judgment. *Rennie*, 720 F.2d at 269, 274. A decision of the institution's staff is presumed valid unless it is shown to be "a substantial departure from accepted professional judgment, practice or standards." *Id.*

The right recognized in *Rennie* has not been extended in this Circuit to convicted prison inmates.[2] Prisoners may well suffer a greater loss of liberty than persons involuntarily committed to mental institutions because prisoners' confinement is intended to punish as well as to rehabilitate. *Cf. Youngberg v. Romeo*, 457 U.S. at 321–22, 102 S.Ct. at 2461. It is settled, however, that prison inmates retain those constitutional rights that are not inconsistent with their status as prisoners or with the legitimate penological objectives of the corrections system. *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 2265, 96 L.Ed.2d 64 (1987) (quoting *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). In addition to punishment and

2. The Court of Appeals for the Eighth Circuit has recently held that convicted federal prisoners possess a qualified due process right to re-

fuse unwanted treatment with anti-psychotic drugs. *United States v. Watson*, 893 F.2d 970 (8th Cir.1990).

rehabilitation of prisoners, prison authorities have a legitimate interest in maintaining safety and security within the prison. *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 2262–64, 96 L.Ed.2d 64 (1987). The State, therefore, has many of the same interests in treating prisoners as it has in treating those who are involuntarily committed to mental institutions. Just as it does for mental patients, the State must provide food, clothing, shelter and medical treatment for inmates; it must also provide secure and safe conditions of confinement to protect society from the prisoners and the prisoners from one another.

We hold that convicted prisoners, like involuntarily committed mental patients, retain a limited right to refuse treatment and a related right to be informed of the proposed treatment and viable alternatives. The scope of the right to refuse treatment, however, must be circumscribed by legitimate countervailing State interests. Given the similarity of the State's interests in the administration of mental hospitals and prisons, the limitation on a prisoner's right of refusal should be similar to the limitation on the right of an involuntarily committed mental patient. Accordingly, a prison may compel a prisoner to accept treatment when prison officials, in the exercise of professional judgment, deem it necessary to carry out valid medical or penological objectives. As in the case of mental institution authorities, the judgment of prison authorities will be presumed valid unless it is shown to be such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment. *Cf. Youngberg v. Romeo*, 457 U.S. at 323, 102 S.Ct. at 2462; *Rennie*, 720 F.2d at 274.

■ A prisoner's right to refuse treatment is useless without knowledge of the proposed treatment. Prisoners have a right to such information as is reasonably necessary to make an informed decision to accept or reject proposed treatment, as well as a reasonable explanation of the viable alternative treatments that can be made available in a prison setting. We recognize that prison doctors' task in communicating with their patients may be difficult. Prisoners' questions may range from reasonable to obstructionist. Prisoners may not bring treatment to a halt, insisting on answers to questions that are unreasonable, time-wasting or intended to turn the doctor-patient relationship into a battle for control over treatment.

Like the right to refuse treatment, a prisoner's right to know must be balanced against valid State interests. One such interest is in providing for the basic needs of inmates—food, shelter, clothing and medical care. The medical care of prison inmates is entrusted to prison doctors, to whose judgment and training courts owe substantial deference. Courts are ill-equipped to specify the medical information that must be provided to prison patients. As in the case of forced treatment of mental patients, courts must exercise a limited form of review. A prison doctor's decision to refuse to answer an inmate's questions about treatment will be presumed valid unless it is such a substantial departure from professional judgment, practice or standards as to demonstrate that the doctor did not base the decision on such a judgment. In exercising judgment, however, the doctor must consider a prisoner's reasonable need to make an informed decision to accept or reject treatment, as well as his need to know any viable alternatives that can be made available in prison.

■ According to the amended complaint, White is allergic to penicillin. For allergic persons, treatment with penicillin may have serious, perhaps life-threatening, consequences. White thus had a reasonable need, and therefore a right, to know whether the proposed treatment contained penicillin. Dr. Napoleon refused to answer White's question and instituted disciplinary proceedings against him for refusing treatment. Drawing all inferences in White's favor, the amended complaint discloses no reason, medical, penological or otherwise, for Dr. Napoleon's refusal to answer White's questions, nor for his attempt to discipline White for refusing treatment without explanation. Rather, the amended

complaint alleges that Dr. Napoleon's only purpose was "to require prisoners to accept whatever treatment Napoleon sadistically [chose] to offer." From the amended complaint, one may fairly infer that Dr. Napoleon's refusal to provide White with information was so far outside the realm of professional judgment as to demonstrate that Dr. Napoleon was not exercising professional judgment at all. In view of the doctor's refusal to tell White whether Debrox contained a potentially harmful drug, White had a right to refuse treatment protected by the Due Process clause of the Fourteenth Amendment. He may not be sanctioned for exercising that right.

■ White's allegations are sufficient to withstand a motion to dismiss. This does not foreclose the possibility that on a motion for summary judgment, White will be unable to substantiate the allegations of the amended complaint, or that Dr. Napoleon will provide valid reasons for withholding information from White.[3]

### V.

■ We note briefly that there is a general allegation in paragraph 162 of the amended complaint that Napoleon "interfered with each patient's enjoyment of the

right to make or withhold informed consent to proposed medical treatment." In White's case, the basis alleged for this cause of action is Napoleon's refusal to tell him the ingredients of Debrox and the subsequent filing of disciplinary charges. As we indicated above, White's claim should be treated as a claim based on the substantive due process right to refuse treatment. Calvin Merle Rogers also alleges Dr. Napoleon interfered with his right to make informed decisions about his treatment. The factual basis alleged for the claim is Dr. Napoleon's refusal to tell Rogers whether the blemishes on his skin were cancerous. Rogers' claim is, in reality, a claim that Napoleon deliberately ignored a potentially serious medical problem deserving proper diagnosis. Thus, it should be treated as a claim based on the Eighth Amendment as interpreted by *Estelle v. Gamble.*[4] As for Nazario and Sabb, neither alleges facts that would support a claim under paragraph 162, and thus their claims under this paragraph were properly dismissed.

### VI.

We will reverse in part and affirm in part the district court's judgment dismissing the amended complaint. We will reverse dismissal of all plaintiffs' Eighth Amendment

---

3. We reject White's specious attempt to cast his refusal to be treated in terms of a political protest protected by the First Amendment. There is no allegation in the complaint that White's refusal was intended to communicate his dissatisfaction with his treatment, nor do we think his act is sufficiently imbued with elements of communication to fall within the scope of the First Amendment. *Spence v. Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727, 2729–30, 41 L.Ed.2d 842 (1974).

4. Although *both* White's and Rogers' allegations speak in terms of "a right to make informed decisions" and "informed consent," they cannot in fairness be read to state a claim based on the tort doctrine of informed consent.

That tort is, in reality, a form of professional negligence. *See* Restatement (Second) of Torts § 892B, comment i at 375 (1979). Typically, plaintiffs in these actions allege that a doctor negligently failed to disclose all the risks associated with an operation, that the plaintiff consented to the operation and was injured as a result. The correct legal standard governing these cases, according to the Restatement, is whether the doctor, in advising the patient, exercised the skill and knowledge normally pos-

sessed by members of his profession in good standing in similar communities. Restatement (Second) of Torts § 299A (1979).

Neither White nor Rogers allege that Napoleon was negligent. On the contrary, they charge that he deliberately and maliciously withheld information. Nor do they allege that they consented to a medical procedure in ignorance and were injured as a result. Rogers was never treated. White refused treatment. Rogers' "informed consent" claim is in reality a charge of deliberate indifference to his serious medical needs, based on the Eighth Amendment. White's claim is part and parcel of his claim based on the right to refuse treatment.

There is, therefore, no need to consider whether torts of informed consent are actionable under section 1983. Under *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) and *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), certain torts do not rise to the level of constitutional violations. We do not resolve whether torts of informed consent fall within the rule of these cases.

claims. We will reverse the dismissal of White's claim of retaliation for exercising his substantive due process right to refuse treatment. We will affirm the dismissal of the "informed consent" claims as to Nazario and Sabb, but reverse as to White and Rogers. These should be treated, in White's case, as part of his right to refuse treatment claim, and in Rogers' case, as part of a claim based on deliberate indifference to serious medical needs. Because the case remains properly in federal court, the district court should also consider the plaintiffs' pendent state claims. Costs taxed against appellee.

SEITZ, *Circuit Judge,* concurring.

It is most regrettable, in my view, that this court is confronted in this delicate area with the necessity of formulating important legal principles in the isolated setting on an appeal from an order dismissing a complaint for failure to state a claim. I believe the court would agree that it would have been far preferable that these principles be formulated in light of an adversarily developed record. Since that course seems unavailable to us, I note my general agreement with the court.

As to part IV of the opinion of the court, I write separately to make clear my basic constitutional position on one area of medical treatment of prisoners. I agree with the court that prisoners are entitled to sufficient disclosures by prison doctors to enable them to decide whether to undergo the treatment or use the prescribed medication and that such an entitlement is entitled to constitutional protection because of their incarcerated status. I also believe an informed and competent prisoner is constitutionally free, based on a liberty interest, to reject treatment and medication as a general rule. This is so because no countervailing state interest is implicated.

I do not think the allegations of this complaint raise any issue as to the right of the state to impose medication or other treatment on a prisoner against his or her will when the prisoner's condition may, medically speaking, impose a threat to the prison community. In such a situation, different constitutional concerns would be implicated.

With these understandings, I concur in the opinion of the court.