Frank George McALEESE, Plaintiff,

v.

David S. OWENS, et al., Defendants.

No. CV–88–1669.

United States District Court,
M.D. Pennsylvania.

July 10, 1991.

Frank George McAleese, pro se.

James M. Howley, Scranton, Pa., for defendant HPI Health Care.

Edward E. Knauss, IV, Harrisburg, Pa., for defendant Rugby Laboratories, Inc.

David E. Heisler, Scranton, Pa., for defendant Diamond Drugs.

Richard Douglas Sherman, Office of Atty. Gen., Harrisburg, Pa., for defendants David S. Owens, Glen Jeffes, Robert Freeman, Thomas Fulcomer, Thomas Meloy, M.D., R. Arora, M.D., and Martin Suomela.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND

Plaintiff Frank George McAleese, an inmate at the Pennsylvania State Correctional Institution at Rockview ("SCI–Rockview"), filed this section 1983 action alleging violations of his Eighth and Fourteenth Amendment rights by the administrative and medical staff at Rockview. He also alleges negligence and strict liability claims against drug and pharmaceutical companies who supplied a drug prescribed for McAleese by the prison medical staff.

Plaintiff alleges after he tested positive for tuberculosis in September of 1986 (while he was incarcerated at SCI–Camp

Hill), the medical staff prescribed a regimen of chemotherapy which included a drug called Isoniazid, but failed to warn him of its possible side effects. He further alleges that as a result of ingesting the Isoniazid he suffered vision problems which he reported to the medical staff. Plaintiff contends, among other things, that the state defendants followed a policy of withholding label warnings and other pertinent information from inmates taking prescription drugs and further contends that he was not permitted to examine the container which the Isoniazid came in or review cautionary instructions concerning its use. Following his transfer to SCI–Huntingdon, he continued on the Isoniazid regimen and allegedly continued to suffer vision problems.

The defendants can be categorized in four groups: (1) state employees—David S. Owens, Pennsylvania Commissioner of Corrections; Glen Jeffes, the former Commissioner; Robert Freeman, the Superintendent of the State Correctional Institution at Camp Hill, Pennsylvania ("SCI–Camp Hill") (where plaintiff was formerly incarcerated); Thomas Fulcomer, the Superintendent of the State Correctional Institution at Huntingdon, Pennsylvania ("SCI–Huntingdon") (where plaintiff was formerly incarcerated); Terry Henry, Deputy Superintendent for Treatment at SCI–Camp Hill; Thomas Meloy, M.D., a prison physician who treated plaintiff; R. Arora, M.D., the prison physician who allegedly initiated Isoniazid therapy for plaintiff; and Martin Suomela, the Director of Medical Services at SCI–Huntingdon (hereafter collectively the "state defendants"); (2) the drug companies and pharmaceutical manufacturers whom plaintiff has sued in negligence and strict liability—Diamond Drugs, Inc.; Rugby Laboratories, Inc. and HPI Health Care; (3) defendants who were named in the complaint but against whom service has never been effected—Anthony Zumpetta and "John Doe Pharmaceutical Company"; and (4) defendants who have been dismissed from the case by prior order of court—Edith Burkett, M.D. and Hoo J. Cheung, M.D.

In a report filed January 16, 1991, the Honorable Joseph F. Cimini, United States Magistrate Judge, recommended the following: (1) dismissal of all claims against HPI Health Care in light of defense counsel's unrefuted representation that this claim has been settled; (2) grant of summary judgment in favor of defendant Rugby Laboratories, Inc. ("Rugby") on all claims; (3) denial of summary judgment in favor of defendant Diamond Drugs, Inc. ("Diamond"); and (4) grant in part, and denial in part, of the motion for summary judgment filed by the state defendants—denial of the motion as to defendants Meloy, Arora and Suomela and grant of the motion as to defendants Owens, Jeffes, Freeman, Fulcomer and Henry.

For the reasons stated below, the court will accept most, but not all, of the magistrate judge's recommendations.

*Discussion*

A. Standard of judicial review of magistrate report

Defendants Meloy, Arora and Suomela have filed objections to Magistrate Judge Cimini's report, protesting his recommendation that their motion for summary judgment be denied. No objections have been filed to any other recommendations made by Magistrate Judge Cimini.

When no objections are filed, the court need only review a magistrate judge's report as it in its discretion deems appropriate. A magistrate judge's finding or ruling on a motion or issue properly becomes the holding of the court unless objections are filed. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

If objections are filed to the report of a magistrate judge, we are required to make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objections are made. We may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1) and Local Rule 904.2. Although our review is *de novo*, we are permitted, by statute, to rely upon the

magistrate judge's proposed findings and recommendations to the extent we, in the exercise of sound discretion, deem proper. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980). *Accord: Goney v. Clark,* 749 F.2d 5, 7 (3d Cir.1984).

Because objections were filed only to the recommendation that summary judgment be denied as to defendants Meloy, Arora and Suomela, we will conduct a *de novo* review of only that portion of the report. The remainder of the report we adopt as our own, because we agree with the reasons stated and because no objections were filed.

**B. Motion for summary judgment standard**

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" Fed. R.Civ.P. 56(c) (Emphasis supplied).

> ... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, an on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra* at 323 and 325, 106 S.Ct. at 2552 and 2553.

Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson, supra,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988).

**C. Eighth Amendment standards**

Plaintiff's claims against defendants Meloy, Arora and Suomela are based on their alleged violation of his Eighth Amendment rights. To recover under the Eighth Amendment claim, the plaintiff must prove specific facts which show that the defendants exhibited a "deliberate indifference" to his serious medical needs. Deliberate indifference is more than inadvertence or a good faith error; it is characterized by "obduracy and wantonness." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). A "serious medical need" is one "that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Farmer v. Carlson,* 685 F.Supp. 1335, 1339 (M.D.Pa.1988). Negligent misdiagnosis or an inadvertent failure to provide care does not establish a constitutional violation. *Estelle v. Gamble,* 429 U.S. 97, 104–106, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). "The courts will not intervene upon allegation of mere negligence, mistake or difference of opinion ... For a constitutional tort to arise and for a cause of action to be stated under section 1983,

the complainant must allege deliberate indifference to his continued health and well-being." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977). There must be proof that the conduct alleged was deliberate and intentional. *Hampton v. Holmesburg*, 546 F.2d 1077, 1081 (3d Cir.1976).

This test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment ... which remains a question of sound professional judgment.' " *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979), quoting *Bowring, supra*, 551 F.2d at 48.

Although the courts generally are reluctant to find an Eighth Amendment violation if a prison inmate has received medical treatment of some kind, that reluctance does not mean that "deliberate indifference" can never be found if a course of treatment has been followed. If the treatment rendered was so inappropriate or inadequate as to "evidence intentional maltreatment" it violates the Eighth Amendment. *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir.1990), citing *Cotton v. Hutto*, 540 F.2d 412, 414 (8th Cir.1976), and *Green v. Carlson*, 581 F.2d 669, 675 (7th Cir.1978), aff'd, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).

D.  Motion for summary judgment by Drs. Meloy and Arora

Magistrate Judge Cimini bases his recommendation that summary judgment be denied as to Drs. Meloy and Arora and Medical Director Suomela[1] on a finding that material issues of fact remain as to their alleged role in denying plaintiff pertinent information about the possible side effects of Isoniazid. We reject that recommendation and find that both the Magistrate Judge and the parties have failed to focus on the central issue,[2] which is whether McAleese has demonstrated facts sufficient to show a violation of his constitutional rights due to defendants' alleged failure to convey complete and accurate information about the potential side effects of Isoniazid and/or to discontinue the course of medication after McAleese began reporting vision problems.

The Third Circuit addressed these issues in *White v. Napoleon*, 897 F.2d 103, 111–14 (3d Cir.1990). The court held that under the due process clause of the Fourteenth Amendment, "convicted prisoners, like involuntarily committed mental patients, retain a limited right to refuse treatment and a related right to be informed of the proposed treatment and viable alternatives." This right is circumscribed by "legitimate countervailing State interests." "[A] prison may compel a prisoner to accept treatment when prison officials, in the exercise of professional judgment, deem it necessary to carry out valid medical or penological objectives." *White, supra*, 897 F.2d at 113. Additionally, the judgment of prison authorities is presumed valid unless plaintiff can demonstrate that the procedure followed was "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *White, supra*, 897 F.2d at 113. Cf. *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982) and *Rennie v.*

---

1.  Thomas Meloy, M.D. and R. Arora are staff physicians who prescribed Isoniazid for the plaintiff. Martin Suomela is the Correctional Health Care Administrator at SCI–Huntingdon.

2.  The defendants base their objections to Magistrate Judge Cimini's recommendation on four contentions. They argue that (1) undisputed medical evidence establishes that plaintiff was not adversely affected by the Isoniazid; (2) that Magistrate Judge Cimini misinterprets the facts in finding that there is a material issue of fact as to whether precautionary information was withheld from plaintiff by defendants because there is no evidence that plaintiff asked for such information; (3) even if plaintiff did ask for the information, plaintiff himself states that he asked the nurses, not the treating physicians, for such information; and (4) plaintiff has not demonstrated a serious medical need.

These contentions miss the crux of the case: whether plaintiff has established facts sufficient to demonstrate a violation of his constitutional rights.

*Klein,* 720 F.2d 266, 274 (3d Cir.1983). The Third Circuit further held:

A prisoner's right to refuse treatment is useless without knowledge of the proposed treatment. Prisoners have a right to such information as is reasonably necessary to make an informed decision to accept or reject proposed treatment, as well as a reasonable explanation of the viable alternative treatments that can be made available in a prison setting. We recognize that prison doctor's task in communicating with their patients may be difficult. Prisoners' questions may range from reasonable to obstructionist. Prisoners may not bring treatment to a halt, insisting on answers to questions that are unreasonable, time-wasting or intended to turn the doctor-patient relationship into a battle for control over treatment.

Like the right to refuse treatment, a prisoner's right to know must be balanced against valid State interests. One such interest is in providing for the basic needs of inmates—food, shelter, clothing and medical care. The medical care of prison inmates is entrusted to prison doctors, to whose judgment and training courts owe substantial deference. Courts are ill-equipped to specify the medical information that must be provided to prison patients. As in the case of forced treatment of mental patients, courts must exercise a limited form of review. **A prison doctor's decision to refuse to answer an inmate's questions about treatment will be presumed valid unless it is such a substantial departure from professional judgment, practice or standards as to demonstrate that the doctor did not base the decision on such a judgment. In exercising judgment, however, the doctor must consider a prisoner's reasonable need to make an informed decision to accept or reject treatment, as well as his need to know** any viable alternatives that can be made available in prison.

*White, supra,* 897 F.2d at 113 (emphasis supplied).

■ Applying these criteria to the facts before us, we find that the treating physicians have demonstrated valid medical reasons for prescribing Isoniazid without warning McAleese of possible adverse consequences to his eyesight, and that McAleese's attempts to rebut this showing have been unsuccessful.

Evidence adduced by the defendants on this issue includes an affidavit from Thomas R. Meloy, M.D., Medical Director at SCI–Huntingdon, in which he states, *inter alia,* that the standard, and accepted, preventive therapy for a patient in McAleese's position, (who has tested positive on a skin test for tuberculosis but has a normal chest x-ray) is a "regime of nine to twelve months of INH" (Isoniazid); that McAleese had been started on this course of treatment while he was incarcerated at SCI–Camp Hill and was continued on it after his transfer to SCI–Huntingdon in November, 1986 "so that he would receive the twelve-month regimen"; that as a physician, Meloy has been "prescribing Isoniazid for tuberculosis-related problems for over twenty years" and that Isoniazid is currently the only effective tuberculosis preventive medication available. Meloy states that other medications used in combination with, or as a substitute for, Isoniazid are not tuberculosis-preventive, but are instead intended for the treatment of actual tuberculosis disease and do not have the preventive properties Isoniazid possesses.[3] Dr. Meloy further stated:

20. In over twenty years of prescribing Isoniazid, I have only encountered an inmate's adverse reaction to Isoniazid once. That one time, the inmate developed an elevated liver enzyme level.

21. I have never seen an inmate who has developed vision problems as a result

---

**3.** McAleese testified to the contrary in his deposition taken by defense counsel on June 22, 1989, but has not produced any medical evidence substantiating his testimony on this subject. He also indicated that although he recalled seeing information indicating that alternative medications were available, he did not know whether the alternatives mentioned were effective in preventing a flare-up of tuberculosis, the purpose for which Isoniazid is administered. (Record Document No. 113, Exhibit I, pp. 30–31).

of being administered Isoniazid. Isoniazid is not a prime suspect of vision problems in users. Rather, the incidence of Isoniazid-induced adverse side effects resulting in visual damage are quite rare.

. . . .

23. On November 21, 1986, the first time I saw McAleese, I prescribed the Isoniazid continued because of the previous [tuberculosis] tests. At that time, McAleese stated that he was having some visual difficulty. Because of his complaint, I referred him to Dr. Burgess, the institution's optometrist, for a visual examination.

24. McAleese was examined for his visual complaints by Dr. Burgess on January 15, 1987.

25. I next saw McAleese in regard to his visual complaints on December 2, 1986. At that time, McAleese said he felt his problem may be related to the Isoniazid. I suggested that the Isoniazid be discontinued. McAleese, however, did not want to stop taking the medication.[4]

26. On December 21, 1986, I again saw McAleese and ordered a 30 day refill of the Isoniazid prescription. At that time, McAleese did not complain of blurred vision.

27. On January 25, 1987, I ordered McAleese's Isoniazid prescription renewed. McAleese did not complain of vision problems at this time.

28. On April 20, 1987, I again renewed McAleese's prescription of Isoniazid. McAleese did not complain of vision problems at that time although he did complain of other physical problems.

29. I again authorized the refill of McAleese's Isoniazid prescription on May 31, 1987.

30. On June 5, 1987, I examined McAleese in regard to complaints of blurred vision. Because of his complaints, I referred McAleese to Dr. Agnes Bunyor, an ophthalmologist.

. . . .

32. The final contact I had in regard to McAleese's vision problems was on July 29, 1987 when I refilled his Isoniazid prescription for a thirty-day period.

. . . .

35. **During the period that Isoniazid was prescribed to McAleese and through my examination and the examination of two outside physicians, there was never any indication that Isoniazid was the cause of McAleese's alleged eye problems.**

36. **If any inmate wishes to read literature regarding a medication being prescribed to him, he only needs to ask for such information. The infirmary at SCI–Huntingdon has a Physicians Desk Reference manual available for inmate's consultation.**

37. During the time I treated McAleese, he never asked me to see information regarding the medicinal compound Isoniazid.

38. I acted in good faith at all time (sic) when dealing with McAleese with the sole intent of treating his actual physical ailments.

(Record Document No. 113, Exhibit "B". Emphasis supplied.) Dr. Meloy's statements about the course of treatment which McAleese receiving while he was on the Isoniazid regime at SCI–Huntingdon are consistent with his medical records. (Record Document No. 113, Exhibit "H")

Defendants also submitted an affidavit from Hugh Rogers, M.D., a physician under contract with the Pennsylvania Department of Corrections to provide medical services to inmates at SCI–Rockview/Dr. Rogers reaffirms many of the statements made by Dr. Meloy regarding the advisability of the course of treatment on Isoniazid prescribed for McAleese. Dr. Rogers further states that:

8. **In my forty-three years of medical practice and through countless prescriptions of Isoniazid, I have never observed one instance in which a patient has experienced vision problems**

---

4. This statement is supported by McAleese's medical records. See (Record Document No. 113, Exhibit "H").

induced by the administration of Isoniazid.

. . . .

10. McAleese's medical records indicate that he had been examined by Dr. Lenworth Johnson of the Hershey Medical Center on July 20, 1988.

11. Dr. Johnson states. . . . 'Mr. McAleese does not have optic neuropathy from Isoniazid.'

12. **The report of Dr. Johnson is unmistakably clear. . . . There is simply no reason to believe that Isoniazid caused any visual problem to McAleese as there is no objective evidence of any real or disease-related injury presented in the report.**

(Record Document No. 113, Exhibit "D". Emphasis supplied.)

Defendants' evidence in support of their motion may be summarized as follows. Both physicians stated that Isoniazid is standard treatment for a patient with McAleese's symptoms, is commonly used for the purpose for which it was prescribed, that there are no alternative medications currently available which function as a preventive treatment and that compli-

cations causing visual problems from this course of treatment are virtually unheard of, even though it is commonly prescribed. Prison physicians monitored McAleese's course of treatment, took his complaints of vision problems seriously and referred him for further evaluation when the circumstances warranted. (Record Document No. 113, Exhibit "H").

The evidence presented by McAleese to counter defendants' motion establishes nothing more than that an inference that a difference of opinion among medical professionals is *possible*, i.e. that the advisability of continuing a patient on a regime of Isoniazid may be questioned if the patient experiences vision problems. Even this we are not certain is justified by the evidence presented by plaintiff,[5] but, in the spirit of giving plaintiff the benefit of all reasonable inferences which might be drawn from the evidence, we will presume it to be an established fact. It is, nevertheless, insufficient to prove a violation of plaintiff's constitutional right to informed treatment under *White*.

Although plaintiff has submitted some medical evidence [6] substantiating his claim

---

**5.** The bulk of the evidence plaintiff has adduced to counter defendants' motion is based on his own deposition testimony and his lay opinion interpreting statements he has read in medical journals and other sources as to contraindications for the use of Isoniazid and the existence of possible treatment alternatives.

McAleese testified, for example, that, based on information he has read or been told about Isoniazid and its possible side effects, he thought that he should have been given an ophthalmological examination before beginning Isoniazid therapy and that his treatment plan should have been reevaluated after he reported experiencing vision problems. (Record Document No. 113, Exhibit "I", pp. 32–33).

**6.** Plaintiff has submitted a letter from Dr. Jeffrey Heimer dated June 22, 1988 and addressed to Robert B. Stewart, Esq. (Record Document No. 115, Exhibit "C"), in which Dr. Heimer states:

This letter is in response to requests for medical information which I have received from Mr. Frank McAleese ... Mr. McAleese ... has raised numerous questions regarding his ocular status. The following is a summary of multiple evaluations performed in my office. Mr. McAleese. . . . presented to my office with a complaint of blurred vision, both at distance and near. His past medical history is signifi-

cant for the year of treatment with Isoniazid for therapy of tuberculosis. This medication was discontinued in the Fall of 1987. This medication has been known to cause damage to the optic nerves in some patients with a history of prolonged use. Mr. McAleese's best corrected visual acuity was 20/80, at distance and near, in each eye. . . . An automated visual field examination was obtained on February 19, 1988. The study showed normal central vision, though with very poor peripheral vision in each eye. It is difficult to determine whether or not this test is reliable. A Visual Evoked Potential was performed at Centre Community Hospital on March 4, 1988. Although this test has some limitations, it was markedly abnormal and may be consistent with a bilateral optic nerve problem.

Thus, at this point, there is evidence of a bilateral, nonprogressive optic nerve problem. There are some inconsistencies and it is difficult to determine the exact nature of this problem. If this is real, it may be related to his previous Isoniazid therapy. There is an additional visual field evaluation I would like to have performed in our office, that I believe may help determine the exact extent of his visual impairment. We have tried to schedule this through the penitentiary in the recent past, without success.

that use of Isoniazid has been linked to vision damage and that he suffers from optical damage, that alone, is insufficient to establish a constitutional claim.

In *White*, the court was careful to note that its decision did not limit or abrogate traditional principles requiring that courts accord considerable deference to physicians' professional judgment, particularly in the prison setting, and stressed that it is not the court's role to second-guess the professional decisions or to engage in its own risk-benefit analysis. That is precisely what this court, or the trier of fact, would have to do if we were to allow McAleese to proceed to trial against the physicians. The trier of fact would have to decide the propriety of their decision to continue McAleese on Isoniazid in the face of a risk, possibly slight, possibly substantial, that he would suffer a documented, but apparently rare, side effect from the continuing use.

Allowing the case to proceed to trial on this basis would result in our converting a common law tort, alleged medical malpractice, into a constitutional violation, and that is a result that the Third Circuit did not intend. Its purpose was to recognize that inmates have a constitutional avenue for challenging medical care if the conduct of the treating physician falls so far outside the bounds of professional conduct that it does not constitute an exercise of professional discretion at all.

This impression is reenforced when we compare the facts presented here with those alleged in *White*. The gravamen of White's complaint was that the prison physician had deliberately refused to tell him whether the medication prescribed for him contained penicillin. This outright refusal to convey information specifically requested by the inmate could not readily be justified on any medical or professional basis and created the possibility of serious health risk to White, since he could have suffered life-threatening complications due to a penicillin allergy. This refusal, the Third Circuit found, "was so far outside the realm of professional judgment as to demonstrate that Dr. Napoleon was not exercising professional judgment at all." *White, supra,* 897 F.2d at 114. The Third Circuit did not foreclose the possibility that Dr. Napoleon could prevail on a motion for summary judgment if he demonstrated valid medical reasons for withholding the information White requested. *White, supra,* 897 F.2d at 114.

Based on these distinctions and on the nature of the right recognized by the Third Circuit, we find that McAleese has failed to demonstrate a viable claim for violation of a constitutional right and on that basis will enter an order directing summary judgment in favor of the physicians, Drs. Meloy and Arora.

E.   Motion for summary judgment by defendant Suomela

We conclude that summary judgment in favor of defendant Suomela is also appropriate, although for different reasons. Suomela states in an affidavit filed in support of defendants' motion for summary judgement, that as Health Care Administrator, his duties consist, among other

---

Dr. Heimer later submitted an affidavit, which defendants incorporated in the documents filed in support of their motion for summary judgment, stating, *inter alia,* that despite the examinations and tests he conducted on McAleese, he was unable to "determine the precise nature of McAleese's complained-of visual problems or the cause thereof. Therefore, I determined that McAleese should be referred to a neuro-ophthalmologist who could better evaluate the situation." This referral produced a report from Dr. Lenworth Johnson, who found, *inter alia,* that "Mr. McAleese does not have optic neuropathy from Isoniazid."

We find that Dr. Heimer's initial findings, as stated in his letter of June, 1988 raise a material issue of fact as to whether McAleese suffered harm due to the Isoniazid. Under different circumstances, we might require a stronger showing of proof from the plaintiff, i.e. a more recent examination, an explanation for the subsequent statements by Dr. Heimer in his affidavit, etc. In this case, however, we believe that it is appropriate to subject plaintiff to a somewhat less rigorous requirement of proof, given his situation. He is currently incarcerated and has been incarcerated since the inception of this action. He has, therefore, had no opportunity to have his eyes examined by another physician of own choosing. We relax the proof requirement somewhat only because the record does contain some medical evidence of visual impairment. Had the record not contained such evidence, we would not have been so inclined.

things, of ensuring that medical care is available to inmates. He further states that he is not a physician, and does not prescribe medication or make decisions regarding the course of treatment prescribed for inmates and that such decisions are left to the medical staff. (Record Document No. 113, Exhibit "A") We could find no evidence in the record controverting these statements.

An individual cannot be held liable in a section 1983 action unless he caused or participated in an alleged violation of constitutional rights. Section 1983 claims cannot be based on respondeat superior. Without a showing of direct responsibility for an alleged violation, liability will not lie against a supervisory official. "A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Campbell v. Lane*, No. 89–C–8289 (E.D.Ill. Oct. 25, 1990) (available on WESTLAW at 1990 WL 171598) citing *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983). See also: *Duncan v. Duckworth*, 644 F.2d 653, 656 (7th Cir.1981) (Plaintiff could not recover against prison warden for alleged Eighth Amendment violations, since it was unlikely that he participated in day-to-day decisions leading to the alleged delay in plaintiff receiving treatment) and *Ford v. Lane*, 714 F.Supp. 310, 315–16 (N.D.Ill.1989) (Prison warden and director of Department of Corrections could not be held responsible, based on their supervisory positions, for medical care alleged to be inadequate).

■ If supervisory individuals have knowledge of a constitutional violation and fail to act, their inaction may constitute a basis for liability. See, e.g., *Chapman v. Pickett*, 801 F.2d 912, 918 (7th Cir.1986) and *Smith v. Rowe*, 761 F.2d 360, 368–69 (7th Cir.1985).

■ As stated above, we view the issue in this case as whether failure of a physician to inform an inmate of the risks associated with medication he is administered can constitute deliberate indifference under the Eighth Amendment. We do not see a basis in the record for holding Suomela, the Health Care Administrator, liable under the

circumstances, since he is not a physician and was not in a position to assess on a case-by-case basis whether critical information about potential side effects was withheld from inmates. Although plaintiff alleges that the medical staff routinely does not disclose such information to inmates, we view the issue as whether, in this case, the information withheld was so critical—the potential side effects so serious—that to withhold such information under the circumstances constituted deliberate indifference to plaintiff's welfare. We perceive no basis for a finding of individual involvement on the part of the health care administrator, and, accordingly, find that summary judgment in his favor is appropriate.

An order will be entered consistent with this memorandum.

### ORDER

For the reasons stated in the accompanying memorandum, IT IS ORDERED THAT:

1. The court adopts the report of Magistrate Judge Joseph F. Cimini (Record Document No. 27, filed January 16, 1991) and follows the recommendations made therein to the extent stated in this order and the accompanying memorandum.

2. All claims against defendant HPI Health Care are dismissed with prejudice in light of the uncontested representations that a settlement has been effected.

3. The motion for summary judgment filed by defendant Rugby Laboratories, Inc. ("Rugby") is granted. Summary judgment is entered in favor of Rugby on all claims and cross-claims.

4. The motion for summary judgment filed by defendant Diamond Drugs, Inc. is denied.

5. The motion for summary judgment filed by defendants David S. Owens, Pennsylvania Commissioner of Corrections; Glen Jeffes, the former Commissioner; Robert Freeman, Superintendent of the State Correctional Institution at Camp Hill, Pennsylvania; Thomas Fulcomer, the Superintendent of the State Correctional Institution at Huntingdon, Pennsylvania;

**264**

Thomas Meloy, M.D.; R. Arora, M.D., and Martin Suomela is granted.

6. The Clerk of Court is directed to defer entry of summary judgment in favor of any defendant until conclusion of the entire case.

7. Plaintiff's claims against defendants Anthony Zumpetta and John Doe Pharmaceutical Company are dismissed pursuant to Fed.R.Civ.P. 41(b) for failure to prosecute.

8. This case is remanded to Magistrate Judge Cimini for further proceedings consistent with this order.

9. The Clerk of Court is directed to send a copy of this order and the accompanying memorandum to Magistrate Judge Cimini.