**Amy UNTERBERG, Plaintiff,**

**v.**

**CORRECTIONAL MEDICAL SYSTEMS, INC., a/k/a ARA Health Services, Inc., and Dr. Lauro Geronimo, The County of Lehigh, and John Doe and Jane Doe, Defendants.**

**Civ.A. No. 90–4410.**

United States District Court, E.D. Pennsylvania.

March 27, 1992.

491

Edward Eidelman, Mary J.B. Eidelman, Black McCarthy Eidelman & Feinberg, Allentown, Pa., for plaintiff.

George M. Nace, III, Thomas M. Caffrey, Asst. County Sol., County of Lehigh, Allentown, Pa., Edwin L. Scherlis, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Plaintiff, Amy Unterberg a/k/a Amy Unterberg Schaefer, an incompetent by her guardian Susan Unterberg, alleges in this action that she sustained serious injuries as a result of inadequate medical care she received during her incarceration at the Lehigh County Women's Correctional Facility in July of 1988. Plaintiff's action is brought pursuant to 42 U.S.C. § 1983 and alleges violations of plaintiff's rights under the Eight and Fourteenth Amendments to the United States Constitution. Defendants County of Lehigh, John Doe and Jane Doe move for summary judgment pursuant to Fed.R.Civ.P. 56(c). In addition, defendants Dr. Lauro Geronimo and Cor-

rectional Medical Systems, Inc. a/k/a ARA Health Services, Inc. move for partial summary judgment pursuant to Rule 56(c). For the reasons stated below, I shall grant the motion for summary judgment of defendants County of Lehigh, John Doe and Jane Doe and grant the motion for partial summary judgment of defendants Lauro Geronimo, M.D. and Correctional Medical Systems, Inc.

## I. INTRODUCTION.

On July 1, 1988, plaintiff Amy Unterberg was arrested and incarcerated at the Lehigh County Women's Correctional Facility ("Women's Facility"). At approximately 4:15 p.m. on July 1, 1988, Correctional Officer Ocasio reviewed plaintiff's medical history and completed a receiving/screening form. Ocasio noted, *inter alia*, that plaintiff was a daily user of heroin. At 6:20 p.m. on July 1st, Amy Unterberg was given a physical examination by an unidentified nurse at the Women's Facility. The notes from the physical examination state that plaintiff used approximately one-quarter (¼) gram of cocaine per week and used five (5) to six (6) bags of heroin on a daily basis.

On July 2, 1988, an unidentified correctional officer informed Nurse Diane Geraci that plaintiff was not feeling well. In response, Nurse Geraci visited and examined plaintiff in her cell at approximately 7:10 p.m. on July 2, 1988.[1] Plaintiff complained to Nurse Geraci that she was experiencing pain in her chest and shortness of breath. Nurse Geraci telephoned defendant Dr. Lauro Geronimo and informed Dr. Geronimo of plaintiff's condition. Nurse Geraci and Dr. Geronimo discussed plaintiff's medical condition and concluded that there was inflammation in plaintiff's rib cage area. Dr. Geronimo directed that plaintiff be treated with non-prescription Motrin. Amy Unterberg was first given Motrin one hour before sleep on July 2, 1988 at approximately 8:00 p.m.

On July 3, 1988 at approximately 8:15 p.m., Nurse Geraci visited plaintiff in her cell to see how plaintiff was feeling. Geraci took plaintiff's temperature which was recorded as 105.5 degrees. Nurse Geraci attempted to determine the cause of plaintiff's fever. Plaintiff stated to Nurse Geraci that she had not taken any fluids in over a day, excluding those fluids plaintiff had ingested when taking her medication. Plaintiff stated that she had not been eating or drinking because she was afraid of vomiting. In Nurse Geraci's opinion, plaintiff was running a high temperature because of plaintiff's failure to drink liquids and because it was hot in the Women's Facility. Nurse Geraci encouraged plaintiff to drink fluids and explained to plaintiff that one of plaintiff's medications (Donnatal) would prevent plaintiff from vomiting.

On July 3, 1988, Nurse Geraci again visited Amy Unterberg at approximately 9:15 p.m. Plaintiff's temperature had decreased to 102.6 degrees and it appeared that the chest pain plaintiff was experiencing had subsided. Nurse Geraci visited plaintiff a third time on July 3 and administered the prescribed medications. At that time, Nurse Geraci informed plaintiff that if she did not drink fluids her fever would continue. In Nurse Geraci's opinion, plaintiff's temperature decreased and plaintiff began to feel better after drinking fluids.

On July 4, 1988, plaintiff requested and received aspirin and juice from correctional officers at 12:30 a.m. From 12:40 a.m. until 2:10 a.m., correctional officers provided plaintiff with fluids and ice and also took plaintiff's temperature. At 2:10 a.m., the correctional officers took plaintiff's temperature and found it to be 101.4 degrees. At 4:00 a.m., correctional officers asked plaintiff if she needed any Tylenol. Plaintiff responded that she did not want any Tylenol. At 8:00 a.m. plaintiff was examined by an unidentified nurse. The notes from this examination state that plaintiff had a temperature of 102.2 degrees and that her lungs and throat were clear. Further, the notes reflect that plaintiff was scheduled to be examined by Dr. Geronimo. Nurse Geraci visited plaintiff

---

1. The medical chart states that this visit occurred at 7:10 a.m. on July 2, 1988. Nurse Geraci believes that the chart should state 7:10 p.m.

at 8:00 p.m. on July 4th and administered the prescribed medication. At this time, plaintiff did not complain of fever or any other problems.

On July 5, 1988, plaintiff was examined by Dr. Geronimo. Prior to examining plaintiff, Geronimo noted that plaintiff had been running a fever. After examining plaintiff, Geronimo noted that plaintiff was complaining of chest pain, pain of the right shoulder, chills, fever and diarrhea. Geronimo noted that the exam revealed mild erythema (abnormal redness due to capillary congestion) of the throat and nasal congestion. Geronimo found plaintiff's heart beat to be normal and found no heart murmur. In addition, Geronimo found that plaintiff had a "harsh breath sound" and a normal abdomen. Dr. Geronimo concluded that plaintiff did not suffer from diaphoresis or tachycardia of the heart. Based on Geronimo's physical examination of Amy Unterberg, Geronimo ordered a complete blood count, electrolytes, blood, urine and nitrogen tests, as well as a chest x-ray and right shoulder x-ray. Dr. Geronimo also ordered that plaintiff receive Motrin three (3) times daily and Lomotil every four (4) hours as needed for diarrhea. Further, Dr. Geronimo ordered that plaintiff be given a sling to wear because of her shoulder pain. Dr. Geronimo did not order the above listed tests to be performed immediately because, in his opinion, there was no emergency medical situation.

On July 6, 1988, plaintiff was examined by Nurse Wendy Radcliff. Nurse Radcliff noted that plaintiff's temperature was 103.3 degrees and that plaintiff was suffering from chills, vomiting and diarrhea. After examining plaintiff, Nurse Radcliff telephoned Nurse Geraci. After consulting, the two nurses decided that plaintiff should be transferred to an emergency room for further evaluation. According to Nurse Radcliff, the medical care that had been provided to Amy Unterberg was not working because plaintiff's temperature was rising again.

On July 6, 1988, plaintiff was transferred to Allentown General Hospital. It was determined at the hospital that plaintiff was suffering from septicemia (invasion of the blood stream by virulent microorganisms). Treatment for the septicemia began immediately. The septicemia, however, developed into bacterial endocarditis (inflammation of the heart lining and valves by bacterial infection). The endocarditis necessitated heart valve replacement surgery which was performed at Lehigh Valley Hospital Center. Following the surgery, plaintiff suffered complications which lead to permanent brain damage and cortical blindness. Plaintiff asserts that her severe physical and neurological injuries were caused by the inadequate medical care she received at the Women's Facility between July 1 and July 6, 1988.

Defendants Lehigh County and CMS entered into an agreement whereby CMS agreed to provide health care services at Lehigh County Prison commencing on January 1, 1987 for a period of two (2) years. The Lehigh County: CMS contract incorporates by reference a CMS proposal for standards of care. The standards of care proposal delineates CMS' recruitment and training practices. Further, the proposal requires regular meetings between CMS and Lehigh County to monitor CMS' provision of health services and proposes that Lehigh County be involved in the recruitment of personnel at the prison. In addition to this proposal for standards of care, CMS developed a Policies and Procedures Manual for administrative and medical personnel working at the prison. Apparently, these policies and procedures were promulgated in an attempt to have CMS certified by the National Commission of Correctional Health Care of the American Correctional Association.

Plaintiff contends that the treatment she received while at the Women's Facility deviated in a myriad of manners from the procedures set forth in the Women's Facilities' Policies and Procedures Manual ("Manual") and from the standards of care incorporated by reference in the Lehigh County:CMS contract. Further, plaintiff argues that the defendants' conduct created liability under 42 U.S.C. § 1983.

## II. DISCUSSION.[2]

### A. *Standard of Review.*

 Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Conflicting inferences or interpretations of evidence must be decided in favor of the non-moving party. *See Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Where expert reports are produced in discovery and represent the anticipated trial testimony of experts, it is appropriate for the Court to consider the reports in determining the existence of genuine issues of material fact. *See Bogosian v. Gulf Oil Corp.*, 596 F.Supp. 62 (E.D.Pa. 1984). The presence of factual issues, however, will not bar the granting of summary judgment when the issues of fact are not material to the controlling legal principles of the case. *B.J. McAdams, Inc. v. Boggs*, 439 F.Supp. 738 (E.D.Pa.1977). Further, the non-moving party cannot rely on the pleadings or mere legal conclusions. *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96 (3d Cir.1975), *cert. denied* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

### B. *Applicable Standards Under Section 1983.*

 Under 42 U.S.C. § 1983, "the initial inquiry must focus on whether two essential elements ... are present—(1) whether the conduct complained of was committed by a person acting under color of state law and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). Prison officials acting in their official capacity are acting under color of state law. *Featherman v. DiGiacinto*, 617 F.Supp. 431 (E.D.Pa.1985). Further all defendants concede for purposes of their motions for summary judgment that they acted under color of state law.

Defendants challenge the adequacy of plaintiff's claim that defendants' conduct represented a deprivation of plaintiff's Eighth and Fourteenth Amendment rights.[3] An inquiry into a prisoner's constitutional right to receive medical care begins with the Supreme Court's seminal decision in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In *Estelle*, the Court recognized that "[a]n inmate must rely on prison authorities to treat his medical needs, [and that] if the authorities fail to do so, those needs will not be met." *Id.* 429 U.S. at 102, 97 S.Ct. at 290. Hence, the Court concluded that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* 429 U.S. at 104, 97 S.Ct. at 291. The Third Circuit has interpreted the standard enunciated in *Estelle* as stating a two-pronged test: "[i]t requires delib-

---

**2.** Defendant Lehigh County argues that the Section 1983 and state law claims against the unidentified correctional officers, John Doe and Jane Doe, must fail because plaintiff has failed to identify or establish any facts regarding John and Jane Doe. Plaintiff concedes that the federal civil rights claims and pendent state claims should be dismissed. Accordingly, the motion for summary judgment of defendants County of Lehigh, John Doe and Jane Doe will be granted in part and the claims against John and Jane Doe will be dismissed.

**3.** The Court notes that it is unclear whether plaintiff was a pretrial detainee or a convicted prisoner serving a sentence of incarceration when the alleged conduct occurred. Under *Boring v. Kozakiewicz*, 833 F.2d 468 (3d Cir.1987), *cert. denied* 485 U.S. 991, 108 S.Ct. 1298, 98 L.Ed.2d 508 (1988), the deliberate indifference standard of *Estelle v. Gamble* is applied to pretrial detainees where the adequacy of medical care is questioned pursuant to 42 U.S.C. § 1983. As the Court stated in its Order of March 14, 1991: "plaintiff may maintain both theories [Eighth and Fourteenth Amendment theories] by meeting the Eighth Amendment standard governing convicted prisoners." *See* Order of March 14, 1991, *citing Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 n. 31 (3d Cir.1987); *Tillery v. Owens*, 719 F.Supp. 1256 (W.D.Pa.1989); *Boring v. Kozakiewicz*, 833 F.2d 468 (3d Cir.1987), *cert. denied* 488 U.S. 934, 109 S.Ct. 328, 102 L.Ed.2d 345 (1988).

erate indifference on the part of the prison officials and it requires the prisoner's medical needs to be serious." *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir.1987), *cert. denied* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988), *citing Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754 (3d Cir.1979). Defendants do not argue that plaintiff Amy Unterberg fails to meet the serious medical need requirement of the *Monmouth County* test. *Id.* Rather, defendants argue that plaintiff has failed to demonstrate deliberate indifference.

■ It is established that not every prisoner complaint of inadequate medical care rises to the level of a constitutional violation. *See White v. Napoleon*, 897 F.2d 103, 108–109 (3d Cir.1990). In fact, "mere medical malpractice cannot give rise to a violation of the Eighth Amendment." *Id.* The Third Circuit has, however, held that "[w]here prison authorities deny reasonable requests for medical treatment and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest." *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir.1987), *cert. denied* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). In other words, as *Duffy v. Delaware County Board of Prison Inspectors*, 1991 WL 58489 (E.D.Pa.1991) states:

[c]ourts will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains in a question of sound professional judgment." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977). Implicit in this deference to prison medical authorities is the assumption that such an informed judgment has, in fact, been made. When, however, prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment, the constitutional standard of *Estelle* has been violated. *West v. Keve*, 571 F.2d 158, 162 (3d Cir.1978). *Id.* at 4–5.

Applying the above standard, the Court must determine whether material issues of fact exist regarding defendants' alleged deliberate indifference.

### C. *Deliberate Indifference To Plaintiff's Medical Needs.*

■ Defendants argue that the record establishes plaintiff's failure to demonstrate deliberate indifference on the part of defendants. In essence, defendants assert that because Amy Unterberg was provided with medical care "on each and every day she was incarcerated at the Women's Facility on July of 1988," plaintiff fails to meet the deliberate indifference standard under *Monmouth County*. Lehigh County specifically contends:

[i]t is not deliberate indifference either to fail to make or to incorrectly make a diagnosis of an inmate's medical problem, where the failure to diagnose or the incorrect diagnosis results from a medical decision, and does not result from circumstances or conditions which are nonmedical in nature. Here, if the nurses and Dr. Geronimo failed to correctly diagnose Unterberg's medical condition, even if it is further assumed that Unterberg's medical condition should have been obvious in view of her history of drug abuse, the available evidence of record permits only the conclusion that their failure resulted solely from poor medical judgment, not deliberate indifference.

Lehigh County's Memorandum In Support Of Summary Judgment at 32–33.

Plaintiff responds by contending that a number of cases have found constitutional violations where minimal care is provided, but medical personnel fail to follow well-known or proper procedures or treat a patient in a perfunctory manner. *See* Plaintiff's Memorandum In Opposition To Lehigh County's Motion For Summary Judgment at 16–17, *citing White v. Napoleon*, 897 F.2d 103 (3d Cir.1990) (holding that where complaint alleged that prison doctor intended to inflict pain without medical jus-

tification, complaint stated cause of action under Eighth Amendment that survived motion to dismiss); *Moreland v. Wharton,* 899 F.2d 1168 (11th Cir.1990) (holding that complaint for Eighth Amendment violation was improperly dismissed by district court); *Wood v. Sunn,* 865 F.2d 982 (9th Cir.1988) (holding that decision by medical director and physician consultant that prisoner's pain was psychological and therefore did not require medical attention constituted deliberate indifference because given the prisoner's medical history, "no one could reasonably believe that indifference to his complaints would not create the unnecessary and wanton infliction of pain in violation of the eight amendment." *Id.* at 990); *Ancata v. Prison Health Services,* 769 F.2d 700 (11th Cir.1985) (holding that where "medical care provided was so cursory as to amount to no treatment at all ... in the case of serious medical problems, may violate the Fourteenth Amendment." *Id.* at 704); *Robinson v. Moreland,* 655 F.2d 887 (8th Cir.1981) (holding that evidence of deliberate indifference was adequate where prison guard had provided ice to prisoner, but refused to send prisoner to hospital or consult nurse when prisoner complained of broken hand).[4]

Plaintiff also relies on several medical expert reports in support of the position that material issues of fact exist regarding defendants' alleged deliberate indifference. In relevant part, the expert reports state:

> The medicines which she [plaintiff] received, aspirin, Motrin and ice are not prescriptive medicines and certainly do not constitute "medical treatment" for a life threatening bacterial infection. They are symptomatic measures which the mother of a family might take to relieve symptoms in a child. Considering the

spectrum of illness which must be entertained in an IV drug abuser with a temperature of 105 degrees, these drugs are not treatment.

*See* Report of Dr. Hammory at 3.

> My opinion, to a reasonable degree of medical certainty, is that Ms. Unterberg received *no* medical treatment at all for her serious medical condition while in Lehigh County Prison from July 1 to July 6, 1988. The administration of Motrin, ice, aspirin, juice, CTM and Glycotoss do not constitute medical treatment, because they did nothing at all to address her serious medical condition. Indeed, no treatment at all would have been equivalent to all of the above.

*See* Report of Dr. Applebaum at 8.

> To a reasonable degree of medical certainty, my opinion is that the care and attention given to Ms. Unterberg following her initial complaints and throughout the time when Dr. Geronimo finally saw her, was so minimal as to amount to no care at all.

*See* Report of Dr. Stolz at 8.

The expert reports relied upon by plaintiff fail to create genuine issues of material fact regarding deliberate indifference. Plaintiff's experts simply review the treatment provided to plaintiff and state in a conclusory fashion that no medical treatment was provided. This attempt to create an issue of fact where none exists will not stand. There is no issue as to the medical treatment provided to plaintiff. Beginning on July 2, when plaintiff complained that she was not feeling well, plaintiff received medical attention on at least a daily basis until she was transferred to Allentown General Hospital on July 6, 1988. Plaintiff

---

**4.** I note that *White, Moreland, Ancata* and *Robinson* are all factually distinguishable from the instant matter. In *White,* plaintiff's complaint alleged that a prison doctor *intended* to inflict pain on prisoners without medical justification. In *Moreland,* a prisoner alleged that he suffered from a significant health problem and received no treatment despite repeated efforts and requests for medical attention. In *Ancata,* the defendants informed a pre-trial detainee that if he wished to receive specialized medical attention, the pre-trial detainee would (1) be required

to secure a court order mandating specialized treatment and (2) be required to agree to bear the costs of any specialized diagnostic treatment. In *Robinson,* a prison guard administered ice to a broken hand, rather than seeking advice from a nurse, doctor or hospital. The instant case is wholly distinguishable from *White, Moreland, Ancata* and *Robinson.* Here, there is no evidence that requested medical treatment was refused. Further, regular medical attention was provided to plaintiff by trained health care professionals.

may quarrel with the appropriateness of the treatment she received. There is, however, no issue of fact regarding the medical assistance and attention provided to plaintiff at the Women's Facility.

In evaluating whether mere medical malpractice or deliberate indifference has been stated, I conclude that *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077 (3d Cir.1976) is instructive. In *Hampton,* the Third Circuit made clear that medical malpractice alone will not give rise to an Eighth Amendment claim. *Hampton* specifically states:

> to establish a constitutional violation, the indifference must be deliberate and the actions intentional. Moreover, not every injury or illness invokes constitutional protection—only those that are "serious" have that effect. *Neglect, carelessness or malpractice is more properly the subject of a tort action in the state courts.*

*Hampton* at 1081 (emphasis added).

Examination of the facts establishes that plaintiff does not possess a claim under the Eighth and Fourteenth Amendments to the United States Constitution. Here, there is no evidence supporting the conclusion that defendants possessed actual knowledge of an easily preventable, impending harm or exhibited deliberate indifference which caused an easier or less efficacious treatment to be pursued. *See Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990); *Ancata v. Prison Health Services,* 769 F.2d 700 (11th Cir.1985); *West v. Keve,* 571 F.2d 158 (3d Cir.1978).

In consideration of the standards enunciated in *Estelle* and *Hampton* and the established facts regarding the treatment provided to plaintiff at the Women's Facility, I conclude that summary judgment must be entered in favor of defendants on plaintiff's claims under 42 U.S.C. § 1983.

### D. *Defendants' Respondeat Superior Argument.*

■ Even if the Court concluded that plaintiff possessed a claim under Section 1983, the Court would dismiss the Section 1983 claims against Lehigh County and CMS. Defendants County of Lehigh and CMS correctly argue that plaintiff's complaint seeks to impose vicarious liability, which is unavailable under Section 1983. Plaintiff opposes this position and contends that her injuries were caused by a policy or custom of the County of Lehigh and CMS. It is settled that a municipality may be held liable for damages arising out of a violation of constitutional rights. *Monell v. Department of Social Services of The City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding that a municipality is a person for purposes of 42 U.S.C. § 1983). The *Monell* Court expressly excluded liability under Section 1983 on the theory of *respondeat superior:*

> [w]e conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* 436 U.S. at 694, 98 S.Ct. at 2037–38. "Therefore, before municipal liability will attach, a plaintiff must demonstrate both the existence of a policy and a causal link between the policy and the alleged injuries." *Bingham v. City of Pittsburgh,* 658 F.Supp. 655, 658 (W.D.Pa.1987).[5]

A "[p]olicy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990), *quoting Pembaur v. City of Cincinnati,* 475 U.S.

---

**5.** The parties address the majority of their briefing to the issue of deliberate indifference. As defendant Lehigh County correctly notes the key question in regard to causation is: "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *City of Canton v. Harris,* 489 U.S. 378, 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412. As the Court concludes that plaintiff does not possess a claim under Section 1983, the Court need not address the issue of causation.

469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990). In other words, "[c]ustom may be established by proof of knowledge and acquiescence." *Fletcher v. O'Donnell,* 867 F.2d 791, 793–94 (3d Cir.), *cert. denied* 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 591 (1989).

Here, plaintiff contends that defendants (1) failed to recruit personnel to adequately treat the medical needs of inmates; (2) failed to train personnel to adequately treat the medical needs of inmates; and (3) failed to supervise personnel who inadequately treated the medical needs of inmates.

As the Court made clear in *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the inadequacy of training "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police [the trained employees] come into contact." *Canton v. Harris,* 489 U.S. at 388, 109 S.Ct. at 1204. The parties do not disagree as to the legal standards applicable to the respondeat superior issue. Rather, while defendants Lehigh County and CMS contend that there are no genuine issues of material fact and defendants are entitled to judgment as a matter of law, plaintiff argues that issues of fact exist regarding whether Lehigh County and CMS were deliberately indifferent to the rights of prisoners through a failure to adequately recruit, train, and supervise the prison health care providers. Because I conclude that no genuine issues of material fact exist and there is no evidence of deliberate indifference, I must agree with defendants' argu-

ment that plaintiff's claims against Lehigh County and CMS are based on vicarious liability which is unavailable under Section 1983.

In *Canton v. Harris,* the Supreme Court established the following standard for the variety of evidence necessary to show deliberate indifference:

"municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. *Pembaur v. Cincinnati,* 475 U.S. 469, 483–84 [106 S.Ct. 1292, 1300, 89 L.Ed.2d 452] (1986) ... Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983.... It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. *But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.*

*Canton v. Harris,* 489 U.S. 378, 389–90, 109 S.Ct. 1197, 1205–06 (1989) (emphasis added). This standard is stringent. Plaintiff has presented no evidence beyond conclusory allegations that policymakers of Lehigh County or CMS exhibited the requisite deliberate indifference to support a Section 1983 claim. Thus, even if plaintiff possessed a claim under Section 1983 against defendant Geronimo, the Court would dismiss the Section 1983 claims against Lehigh County and CMS.[6]

---

**6.** I note that defendants Geronimo and CMS also moved to dismiss plaintiff's claims for punitive damages under Section 1983. As I conclude that plaintiff does not possess any claim under Section 1983, plaintiff's claims for punitive damages must be rejected. I note, however, that under *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1982), only "reckless or callous disregard for the plaintiff's rights, as

well as intentional violations of federal law, [are] sufficient to trigger a jury's consideration of the appropriateness of punitive damages." *Id.* 461 U.S. at 51, 103 S.Ct. at 1637. Here, plaintiff has failed to establish any facts which would support the conclusion that any defendant acted with reckless or callous disregard for plaintiff's rights or acted intentionally to violate federal law.

### III. CONCLUSION.

For the reasons stated above, I shall grant the motion for summary judgment of defendants Lehigh County, John Doe and Jane Doe and grant the motion for partial summary judgment of defendants Correctional ·Medical Systems, Inc., a/k/a ARA Health Services, Inc. and Dr. Lauro Geronimo.